Revised August 17, 2001

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-10134
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHENARD TYVON WELLS; RODNEY W. WELLS,

Defendants-Appellants,

_____

No. 00-10266
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LOLETTA DENISE SCOTT,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Texas

_____

August 16, 2001

Before JONES, DeMOSS and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This direct criminal appeal involves three appellants who were each convicted of one count of conspiracy to distribute cocaine base and one count of distribution of cocaine base. The appellants raise various arguments, including challenges to evidentiary rulings, jury instructions, and sentencing error. Because we find the erroneous admission of hearsay testimony against Loletta Scott was not harmless, we VACATE her convictions and REMAND for further proceedings. With respect to Rodney Wells, we find the submission of a deliberate ignorance instruction was harmless error, and AFFIRM his convictions. Finally, we conclude that Shenard Wells has not established a presumption of prosecutorial vindictiveness and thus AFFIRM his sentence.

I.   FACTUAL AND PROCEDURAL HISTORY

On March 24, 1999, a grand jury charged Shenard Tyvon Wells (Shenard), his wife, Loletta Scott (Loletta), his brother, Rodney W. Wells (Rodney), and several others with one count of conspiracy to distribute cocaine base and one count of distribution of approximately 26.2 grams of cocaine base. Pursuant to a plea agreement, Shenard pleaded guilty to the distribution count and the government dismissed the count of conspiracy. Also pursuant to the agreement, Shenard promised to provide complete information about his criminal activities and the government agreed that, if he provided substantial assistance, it would file a motion for downward departure pursuant to U.S.S.G. § 5K1.1.

2

On July 19, 1999, the government moved to revoke the plea agreement, alleging that Shenard had failed to fully disclose his criminal conduct and had attempted to kill one government witness and corruptly influence another. At the revocation hearing, the government ultimately relied solely on Shenard's failure to cooperate, and the district court allowed the government to revoke the agreement.

On August 11, 1999, the grand jury returned a superseding indictment again charging Shenard, Loletta, and Rodney with one count of conspiracy to distribute cocaine base and one count of distribution of cocaine base. Additionally, the grand jury charged Shenard with one count of attempting to kill a person to prevent him from communicating with law enforcement officers and one count of attempting to intimidate a witness. Shenard persisted in his plea of guilty to the count alleging distribution and pleaded not guilty to the three remaining counts. Loletta and Rodney pleaded not guilty to the conspiracy and distribution counts.

The government introduced the following evidence at trial. On June 15, 1998, William Block and Darren Lee, both confidential informants for the Drug Enforcement Administration, were looking for a drug dealer named Terrence Spencer in Terrell, Texas. Instead, they ran into Shenard and Mark Perkins.

Lee arranged for Block to buy two ounces of crack cocaine from Shenard. Block and Lee followed Shenard and Perkins to Shenard's apartment, and Rodney met the men at the bottom of the stairway. Loletta was at the apartment when the men arrived and opened the door

3

to allow them entry.

Shenard, Rodney, Block, Lee, and Perkins seated themselves in the den and discussed the transaction. Loletta remained outside the den during the entire transaction. At one point, Shenard called for his wife to bring him the cocaine. However, she was unable to locate it in the refrigerator, and Shenard retrieved it. After some concern was expressed regarding the weight of the cocaine, Shenard asked his brother to borrow scales from a neighbor. Rodney then left the apartment and returned, stating that the neighbor was not home.[1]

Shenard also instructed Loletta to bring him a plastic bag. She complied by handing a bag to Rodney who then gave it to Shenard. Shenard placed the crack cocaine in the bag. After paying cash for the cocaine, Block and Lee left the apartment with the cocaine. Shenard handed Loletta the money, which she took to their bedroom.

All three appellants testified at trial. Each of them, including Shenard, testified that Shenard sold cocaine base. Each of them testified that neither Rodney nor Loletta were involved in the drug business with Shenard.

The appellants do not challenge the sufficiency of the evidence to support their convictions. Therefore, any remaining facts necessary to

---

[1] Rodney testified that he had met Shenard at the apartment to borrow money to purchase diapers for his infant son. Rodney claimed that he initially did not know that Shenard was conducting a drug transaction. He realized it after he had exited the apartment to borrow the scales. According to Rodney, he did not want to be involved in the transaction and did not actually go to the neighbor's apartment. He lied when he told Shenard that the neighbor was not home.

determine their appeals are set forth in our discussion of their claims.

The jury acquitted Shenard of the two obstruction of justice counts, and we therefore do not recite the evidence introduced in support of those charges. The jury found the appellants guilty as charged on the remaining counts.

II. ANALYSIS

A. ADMISSION OF HEARSAY EVIDENCE OF DESTROYED LEDGERS

Loletta argues that the district court erred in overruling her hearsay objections to the testimony of Joseph Antoine, a cooperating witness. Antoine testified concerning his memory of the contents of previously destroyed ledgers that purportedly contained information regarding amounts of drugs he and his friend, Gerard Busby, sold to Loletta. He also testified that he knew Loletta purchased drugs based on representations Busby made to him. We review the district court's decision to allow admission of evidence for abuse of discretion. *United States v. Harrison,* 178 F.3d 374, 379 (5th Cir. 1999).

Prior to the instant trial, Antoine, known as "Spider" on the streets of Houston, pleaded guilty to a charge of conspiracy to distribute cocaine and cocaine base in the Southern District of Texas in exchange for the government's dismissal of three other counts in the indictment against him. During the instant trial, Antoine testified that pursuant to a plea agreement he had promised to "cooperate fully and give full statements." He further testified that he had not been promised anything by either the Houston or Dallas United States

5

Attorney's Office in exchange for his cooperation.

On direct examination, Antoine admitted that he had been involved with drugs since 1992. In 1994 or 1995, Shenard would travel from Terrell to Houston to purchase cocaine base directly from Antoine. Antoine did not know "exactly how many times, but it was a lot of times." Sometime in 1995, Shenard stopped purchasing drugs from Antoine because Shenard was sent to the penitentiary.

Antoine subsequently began using his friend Gerard Busby to make drug deliveries for him. Antoine admitted that he had no personal knowledge of Loletta purchasing drugs. Indeed, he admitted that he had never met her and had never seen her face to face, but thought he had seen the side of her face while she was sitting in a car. Antoine did not identify Loletta in court.

Notwithstanding these admissions, he testified that he and Bubsy kept "little ledgers with the sales on it, and [Loletta's] name would be on it, and [Busby] would speak about her." Antoine asserted that, through Busby, he sold cocaine base to Loletta over a period of six months. Based on the ledgers, Antoine contended that Loletta "mov[ed] more drugs than Shenard."

On cross-examination, Antoine related that he kept a weekly ledger and threw it away each week after he counted the money from the drug sales. He admitted that he "didn't keep a long time ledger, just a weekly ledger."

It is undisputed that Loletta's counsel made hearsay objections to Antoine's testimony regarding the ledgers and to the statements Busby

6

made to Antoine.[2]  On appeal, the government argues that the district court did not err in allowing the testimony.  With respect to Antoine's testimony regarding the destroyed drug ledgers, the government contends that evidence was admissible pursuant to the hearsay exception known as the business records exception under Rule 803(6) of the Federal Rules of Evidence.  Whether evidence is admissible under Rule 803(6) is "chiefly a matter of trustworthiness."  *Mississippi River Grain Elevator, Inc. v. Bartlett & Co.,* 659 F.2d 1314, 1319 (5th Cir. 1981).  Rule 803(6) provides as follows:

> (6) **Records of Regularly Conducted Activity.**–A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

---

[2]  Additionally, at the conclusion of Antoine's testimony, while Loletta's counsel was requesting that Antoine's testimony be stricken because Antoine had no personal knowledge of Loletta purchasing drugs, the prosecutor interrupted, stating: "Objection to this.  I think we need to come to the bench."  The district court responded as follows: "I don't need you to come to the bench.  I'll overrule the objection."  This is the extent of the argument allowed by the district court with respect to the admissibility of Antoine's hearsay testimony.

7

Here, the district court allowed the government to elicit testimony from Antoine without requiring it to establish the above foundational requirements. Antoine testified regarding the volume of drugs Loletta purportedly "moved" in comparison to her husband without first testifying that the ledgers had been "made at or near the time by, or from information transmitted by, a person with knowledge. . . . " Nor did Antoine first testify that either the ledgers were "kept in the course of a regularly conducted business activity, or [that] it was the regular practice of [his] business activity to make the [ledgers.]"

On cross-examination, Antoine explained that he kept a ledger every week of "an inventory of [his] supplies so [his] money [would] be right and [his] drugs [would] be right." Also, each week, he threw away the ledger. This testimony could arguably fulfill the foundational requirements of Rule 803(6).[3] Assuming for purposes of this appeal that if the government had produced the original ledgers they would have qualified as business records under Rule 803(6), we now turn to the government's argument that Antoine's testimony with respect to the

---

[3] We note that it is not clear to us that destroying the ledgers at the end of each week constituted keeping them in the course of a regularly conducted business activity. See *United States v. Holladay,* 566 F.2d 1018, 1020 (5th Cir. 1978) (explaining that notebooks were admissible under Rule 803(6) upon showing that they were part of a bookkeeping system "continuously maintained" for purpose of accounting for receipts and disbursements of defendant's business); *United States v. Jones,* 554 F.2d 251, 252 (5th Cir. 1977) (finding that a proper foundation was laid under Rule 803(6) because the witness was "able to identify the record as authentic and specify that it was made and preserved in the regular course of business"). However, our conclusion that Antoine's testimony was inadmissible does not rest on this basis.

contents of the ledgers was admissible.

The government argues that Antoine's testimony regarding the contents of the ledger was admissible as secondary evidence (under Rule 1004[4]) of the destroyed business records. In support of its argument, the government cites a First Circuit opinion in which a copy of a business record that had been destroyed was held to be admissible. In *United States v. Lizotte,* 856 F.2d 341 (1st Cir. 1988), a lawyer was convicted of conspiring to impede the collection of taxes by assisting a client in hiding drug proceeds. The First Circuit explicitly noted that, in addition to a drug business, the client had a legitimate wholesale business in which he "was accustomed to keeping records." *Id.* at 344. This client also kept records of his drug sales. At the end of each day in 1994, the client would mark his calendar with the amount of drugs that he had sold that day along with a code to identify the buyer. At the end of the year, he copied the weekly sales totals from 1984 to the 1985 calendar's corresponding weeks to allow him to make comparisons between his weekly sales in 1984 and 1985. After transferring the subtotals to the 1985 calendar, the client destroyed the 1984 calendar. The First Circuit held that the 1984 entries constituted a business record under Rule 803(6) and held that the transfer of the record of those entries to the new calendar did not

---

[4] In pertinent part, Rule 1004 provides that "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if– . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. . . ."

9

"destroy its credibility."[5] *Id.* As such, the First Circuit concluded that the original 1984 calendar was admissible under Rule 803(6) and therefore apparently held that the 1985 calendar with the copied entries was properly admitted as secondary evidence.[6]

The government also relies on *United States v. Prevatt,* 526 F.2d 400 (5th Cir. 1976). In that case, the district court allowed the admission of a single sheet of paper upon which an employee had written yearly totals of collection amounts transferred from a notebook. *Id.* at 403. At the time of trial, the original records had been destroyed. We concluded that the notebook was admissible under the Business Records Act, 28 U.S.C. § 1732(a).[7] The notebook was lost at the time of trial, and thus the copy was admissible. *Id.*

While these two cases indicate that documents constituting secondary evidence of destroyed business records may be admissible, they do not stand for the proposition that oral testimony regarding the contents of destroyed business records is admissible. It is undisputed that the government has the burden of proving that the evidence was

---

[5] Although the First Circuit used the word "credibility," as explained below, this Court has looked to the "trustworthiness" of the evidence in making its determination of admissibility.

[6] The First Circuit did not expressly state the basis upon which the 1985 calendar could be admitted. It is not clear if the basis was secondary evidence or whether the court believed a copy of a business record constituted a business record under Rule 803(6).

[7] *See Falcon v. General Telephone Co. of the Southwest,* 626 F.2d 369, 383 (5th Cir. 1980) (noting that the business records exception of Rule 803(6) is very similar to 28 U.S.C. § 1732(a)) *vacated on other grounds,* 450 U.S. 1036, 101 S.Ct. 1752 (1981).

admissible as an exception to the rule against hearsay. The government has not cited a case in which testimony was allowed to suffice as secondary evidence of a business record under Rule 803(6).

The only case we discovered involved the government's use of oral testimony when the business records were available but the government did not introduce them. We found this to be reversible error. In *United States v. Marshall,* 762 F.2d 419 (5th Cir. 1985), a defendant was convicted of theft of property of the United States in excess of $100, *i.e.,* a lawn mower. The allegedly stolen lawn mower was not introduced into evidence. To prove that a lawn mower was missing from the Army and Air Force Exchange Service, the government called an investigator, Terri Stanlin. Stanlin testified, over an hearsay objection, that based on her review of the store's records, three lawn mowers were unaccounted for during this time period. On appeal, the government argued that, because it had allowed defense counsel access to the store's records prior to trial, this Court should review the evidentiary ruling as if the records had been introduced into evidence under Rule 803(6). *Id.* at 426. We rejected this argument, explaining that "instead of the record itself the district court permitted introduction of Ms. Stanlin's 'fact' testimony that her generalized review of the records showed that three lawn mowers were missing from the store." *Id.* We determined that such evidence was clearly inadmissible and constituted reversible error. In sum, we held that:

> reversible error occurred because, over defense
> objection, the trial court permitted a non-expert

11

> to give prejudicial hearsay testimony as to the contents of documents that were not themselves introduced into evidence, which documents, moreover, could not have been introduced without prior authentication, including a query into their trustworthiness for the purpose for which introduced.

Although *Marshall* is not controlling because, unlike the instant case, the original records were available, we believe the basic holding in that case tends to indicate that Antoine's testimony with respect to the contents of the ledgers was hearsay. Again, the government had the burden of proving that the evidence was admissible, and we do not find the authority it cites persuasive.

While recognizing that a district court is given great latitude in determining admissibility under this rule, we simply cannot conclude that the oral testimony of Antoine, a cooperating witness, with respect to his memories of notations of drug sales apparently drafted by someone else several years earlier and destroyed soon thereafter had sufficient indicia of trustworthiness. If we allowed this testimony, we would, in effect, be allowing an end run around the rule against hearsay and the requirements of the business records exception. This we are unwilling to do.

Indeed, the rationale underlying this exception to the rule against hearsay is that the inherent reliability of business records is "supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a

12

continuing job or occupation." Fed.R.Evid. 803(6), Notes of Advisory Committee on Proposed Rules. We have expressly recognized that the "'primary emphasis of rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced.'" *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir.1990)(quoting *United States v. Veytia-Bravo*, 603 F.2d 1187, 1189 (5th Cir.1979)).

We certainly do not decide that, as a general rule, drug ledgers are inadmissible under Rule 803(6). We recognize, of course, that the First and Ninth Circuits have allowed the admission of drug ledgers (or copies thereof) under Rule 803(6).[8] Here, we hold only that, under the circumstances of this case, the oral testimony regarding the destroyed ledgers falls outside the hearsay exception under Rule 803(6). Therefore, the district court clearly abused its discretion in admitting the hearsay testimony of Antoine with respect to the drug "ledgers." *See Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 2047 (1996) (a district court necessarily abuses its discretion when it makes an error of law). In view of our conclusion that the district court abused its discretion in allowing the testimony of the destroyed "ledgers," we must determine whether such error was harmless. In making this

---

[8] *United States v. Foster,* 711 F.2d 871, 882 (9th Cir. 1983) (allowing the drug ledgers after explaining that "[a] record is considered as having been kept in the regular course of business when it is made pursuant to established procedures for the routine and timely making and preserving of business records, and is relied upon by the business in the performance of its functions."); *See also Lizotte,* 856 F.2d at 344 (finding that the transfer of the drug ledger sales to another calendar did not make the document inadmissible under Rule 803(6)).

determination, we view the error in relation to the entire trial. *United States v. Gadison*, 8 F.3d 186, 192 (5th Cir.1993). We must determine whether the inadmissible evidence contributed to the jury's verdict and reversal is warranted "only if the evidence had a 'substantial impact' on the verdict." *Id*. (citation omitted).[9]

The remaining evidence in support of Loletta's convictions for conspiring to distribute crack cocaine and distribution of crack cocaine certainly is not overwhelming. With respect to the drug transaction that occurred on June 15, 1998, Block, a paid government informant, testified that although Loletta never stepped into the room in which the drug transaction was taking place, he thought she was observing the transaction. Block overheard Loletta ask her husband if Block was going to buy all the crack cocaine. Block also testified that, at her husband's request, she retrieved a plastic bag and gave it Rodney, who in turn gave it to her husband. However, on cross-examination, Block admitted that, although he had been "wired" with recording equipment and a transcript had been made of the audiotape, the transcript did not contain Shenard's request of Loletta to bring a bag.

With some prompting from the prosecutor, Mark Perkins, a

---

[9] Although the government shoulders the burden of proving harmless error, *United States v. Munoz,* 150 F.3d 401, 412 (5th Cir. 1998), it does not argue (even in the alternative) that the admission of the ledgers was harmless error. The government does argue that the admission of Antoine's testimony with respect to Busby's statements was harmless error.

cooperating witness, testified that Shenard asked Loletta to get the cocaine from the refrigerator.  Perkins observed Loletta ostensibly looking for the cocaine, but she could not find it. Ultimately, Shenard had to retrieve it.  Perkins asserted that Shenard gave the sale proceeds to Loletta, who took the money to their bedroom.  Clearly, this is sufficient evidence to support Loletta's convictions--but that is not the question.  The question is whether Antoine's testimony (that during a six-month period in which her husband was in jail, Loletta sold more drugs than her husband) had a substantial impact on the verdict.

There are several witnesses who testified that Loletta was present or observed her husband sell drugs.  However, that evidence was undisputed in that Loletta admitted she knew her husband was a drug dealer.

Additionally, one government witness's testimony indicated that Loletta herself sold crack cocaine on one occasion.[10] Darlene Skinner Jones, who admitted that she had smoked crack cocaine for nearly twenty years, testified that although she did not observe the actual transaction, she saw a fellow crack user, Sherry Wilson, who had forty

---

[10]  The charges against Loletta involved only cocaine base. However, Ananias Nickerson, who was charged in the original indictment and pleaded guilty, testified that on one occasion, pursuant to Shenard's instructions, Loletta handed him a "blunt" (apparently a cigar filled with marijuana) and he gave her money that she threw on the seat of the car.  Mark Perkins, who also pleaded guilty after being charged in the original indictment, testified that on one occasion, Shenard told him that he was saving some marijuana for Loletta so that she could take it to "the old girl downstairs" or sell it.

dollars, talk to Loletta and return with crack cocaine. Curiously, on cross-examination, when asked whether Loletta was a drug dealer, Jones responded "Not that I know of." In rebuttal, defense counsel called Sherry Wilson. In direct contradiction of Jones's testimony, Wilson testified that she had never purchased drugs from Loletta. Moreover, another government witness, Victor Robinson, who had lived in Terrell his entire life and had sold crack cocaine with Shenard, testified that he had no knowledge of Loletta selling any drugs.

Loletta's defense essentially was that she was a good wife. She admitted that she knew that her husband was a drug dealer. She introduced evidence to show that she had worked for a factory for the better part of ten years. She introduced *actual* business records proving that she worked full time and even overtime at the factory during the time frame alleged in the indictment. She called witnesses to testify that she had indicated to them that she wanted her husband to quit selling drugs and hold a legitimate job.

We have read the entire record and it is apparent that, prior to the introduction of Antoine's testimony, the jury could have believed that the government had not proven beyond a reasonable doubt that Loletta had the intent to distribute or to conspire to distribute cocaine.

The government apparently perceived that the evidence was not overwhelming and, in rebuttal, called Antoine. His testimony obliterated her defense. He accused her of being a bigger dope pusher

than her husband.  He was allowed to do so even though he admitted that he did not have any personal knowledge of her purported drug sales.  He bolstered his testimony by relying on purported business records of his drug sales.  The only person who had personal knowledge of the contents of the "ledgers" was Gerard Busby, and the government failed to call him.

Because Antoine's testimony was by far the most damning testimony in terms of Loletta's actual involvement in distributing  drugs, we believe that the evidence contributed to the jury's verdict and that it "had a 'substantial impact' on the verdict."  *Gadison*, 8 F.3d at 192.  Accordingly, under these circumstances, we simply cannot say that this error was harmless.  Therefore, we VACATE Loletta Wells' convictions and REMAND for further proceedings.[11]

B.    DELIBERATE IGNORANCE INSTRUCTION

Rodney Wells asserts that the submission of a deliberate ignorance instruction to the jury constitutes reversible error.[12]

---

[11] Because we vacate Loletta's convictions on this basis, we need not reach the other arguments she raises with respect to Antoine's testimony.

[12]  The deliberate ignorance charge read as follows:
> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her.  While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself or herself to the existence of a fact.

17

Rodney testified in his own defense at trial. He related that, on June 15, 1998, he had called his brother Shenard to see if he could borrow money to purchase diapers for his infant son. After calling his brother, Rodney met Shenard at Shenard's apartment to borrow the money. Although he initially did not realize that his brother was conducting a drug transaction, while in route to borrow scales from the neighbor at Shenard's request, Rodney surmised that a drug transaction was taking place. Once he realized the purpose of his errand for Shenard, he decided to report that the neighbor was not home. In short, his defense was that he never knowingly participated or aided and abetted the distribution of cocaine base.

"A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law." *United States v. McKinney*, 53 F.3d 664, 676 (5th Cir. 1995) (citation and internal quotation omitted). "The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Id.* (citation and internal quotation omitted). "It should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *Id.* at 676-77. "The instruction is proper where the evidence shows (1) subjective

18

awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999).

Rodney concedes that if his defense had been that he was merely present at a drug deal and did not know that his brother requested scales in order to weigh the cocaine, a deliberate ignorance instruction would have been proper. He contends, however, that his defense was that he never actually attempted to obtain the scales from the neighbor. He argues that because he testified that he *knew* both that a drug deal was taking place and that the scales were to be used for measuring drugs there was no basis for the submission of the instruction on deliberate ignorance.[13]

---

[13]    Rodney also complains that the prosecutor's closing argument compounded the error. Rodney asserts that the prosecutor argued that it did not matter whether Rodney attempted to obtain the scales. We reject Rodney's interpretation of the prosecutor's argument. Instead, we understand the prosecutor's argument to be that it did not matter whether Rodney was actually successful in his attempt to obtain the scales, only that he attempted to obtain them. Moreover, contrary to Rodney's contentions otherwise, we believe the court's charge, which included the following instruction on "mere presence," would have cured any confusion. The "mere presence" instruction provided:

> Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way

19

Rodney's contentions are partially correct. He testified that at the time his brother asked him to retrieve the scales, he did *not* know there was a drug transaction taking place. In any event, he did testify that, after he left the apartment and was walking to the neighbor's apartment, he realized that his brother was conducting a drug transaction. Assuming that it was error for the district court to submit the instruction, Rodney's admission of actual knowledge proves fatal to his claim. "We have consistently held that an 'error in giving the deliberate ignorance instruction is ... harmless where there is substantial evidence of actual knowledge.'" *Threadgill,* 172 F.3d at 369 (quoting *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993)). Accordingly, we conclude that any error in submitting the charge was harmless.

C. DUE PROCESS VIOLATION

1. District Court's Refusal to Rule

Shenard claims that, in response to exercising his right to trial, the government violated his due process rights by manipulating the sentencing guidelines. He first argues that the district court refused to rule on this objection based on a

which advances some purpose of a conspiracy, does not thereby become a conspirator. . . .
Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that the defendant either directed or aided and abetted a crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

20

technical failure to object to a certain paragraph in the presentence report.

Our careful examination of the record leads us to conclude that the district court did not refuse to rule on his claim of prosecutorial vindictiveness at sentencing based on a technical failure to object to a certain paragraph in the presentence report. It appears to us there are two possible interpretations of the district court's response to Rodney's objection. On one hand, it could be that the district court simply did not perceive that Shenard was raising the due process claim of prosecutorial vindictiveness.[14] Instead, the court understood that Shenard was objecting to the inclusion of the additional amounts of drugs but in doing so failed to articulate any challenge to the "rationale for calculating the amount of crack cocaine [attributable] to [him]."

On the other hand, the government believes that the district court ruled that Shenard could not prevail on his claim of prosecutorial vindictiveness because he had not undermined the factual basis for drug calculation. Under either scenario, it is undisputed that the district court never expressly addressed Shenard's claim of prosecutorial vindictiveness, and the government agrees that the district court's reasoning was not dispositive of this claim. Therefore, regardless of

_____

[14] Although the objection was not precisely made, we believe that it was sufficiently raised in the district court. We note in its brief the government has expressly stated that Shenard's "objection below claimed prosecutorial vindictiveness."

21

the district's interpretation of Shenard's claim of prosecutorial vindictiveness, we now address it on the merits.

2.    Prosecutorial Vindictiveness

As stated, Shenard asserts that the government violated his due process rights by vindictively increasing the drug quantity after he exercised his right to trial. This Court, sitting en banc, has made clear that in deciding claims of prosecutorial or judicial vindictiveness, we should neither attempt to classify the decisions, *e.g.,* pre- or post-trial, nor measure the case against "fixed gauges." *United States v. Krezdorn,* 718 F.2d 1360, 1364 (5th Cir. 1983) (en banc). Instead, we should apply the following test. *Id.* at 1365.

> If the defendant challenges as vindictive a prosecutorial decision to increase the number or severity of charges following a successful appeal, the court must examine the prosecutor's actions in the context of the entire proceedings. If any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of charges was motivated by some purpose other than a vindictive desire to deter or punish appeals, no presumption of vindictiveness is created.

In the case at bar, we must therefore determine whether there is an objective event that should have indicated that the government's decision to hold Shenard responsible for all the drugs attributable to him was motivated by some purpose other than a vindictive desire to punish him for exercising his right to trial. Although *Krezdorn* involved prosecutorial vindictiveness after a successful appeal, we have applied the above-quoted test in a case alleging vindictiveness after

22

the defendant successfully repudiated a plea agreement. *See United States v. Moulder,* 141 F.3d 568 (5th Cir. 1998). In *Moulder,* after pleading guilty pursuant to a plea agreement, the defendants had successfully obtained the district court's dismissal of their convictions based on a subsequent Supreme Court decision. *Id.* at 572. In response, the government reinstated charges that previously had been dismissed pursuant to the plea agreement. We concluded that "it should be clear to a reasonable minded defendant that the dismissal of the . . . conviction in the light of *Bailey*[15] was an event that would certainly motivate the government to reinstate the dismissed drug charge." *Id.* (footnote added).

Initially, the government apparently held Shenard accountable for less drugs as a dispensation for a guilty plea. Subsequently, the district court granted the government's motion to revoke the plea agreement with Shenard, finding "that the undisputed evidence presented by the government supports that contention that Mr. [Shenard] Wells has breached his agreement by failing to cooperate." It seems that a reasonable defendant would understand that his breach of the plea agreement would motivate the government to revoke their decision to hold Shenard accountable for the lesser amount of drugs.

The prosecutor's decision to hold Shenard accountable for the greater quantity of drugs after he breached the plea agreement is

---

[15] 516 U.S. 137, 116 S.Ct. 501 (1995).

23

comparable to the prosecutor's decision in *United States v. Molina-Iguado,* 894 F.2d 1452 (5th Cir. 1990). In *Molina,* the government arrested a defendant on felony and misdemeanor charges, then dropped the felony counts when she signed a plea agreement. At a hearing, however, the defendant refused to consent to the jurisdiction of a magistrate and asserted her right to proceed before a district judge. The government successfully moved to withdraw the plea agreement and reinstated the felony charges. This Court held that the prosecutor's actions did not create a presumption of vindictiveness. *Id.* at 1455.

*Molina-Iguado* suggests that a defendant should realize breaching a plea agreement is an event that could cause the prosecutor to withdraw leniency with respect to the sentencing recommendation previously given. The facts of this case simply do not indicate that the government was punishing Shenard for going to trial. Here, the government moved to have the plea agreement revoked based on Shenard's failure to cooperate.[16] Because a presumption is inappropriate and Shenard has presented no evidence

---

[16] The government's decision was also motivated by the government's belief that Shenard had obstructed justice. Although the jury acquitted Shenard of those charges, the Supreme Court has made clear that acquittal is not a barrier to consideration of the underlying conduct at sentencing so long as that conduct was proven by a preponderance of the evidence. *See United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633 (1997). *Cf. United States v. Stokes,* 124 F.3d 39, 45 (1st Cir. 1997) (explaining that "prosecutors are not required to function as bloodless automatons: they may (indeed, they should) make judgments about dangerousness, set priorities, and give heightened attention to cases which inspire a sense of outrage").

24

of actual vindictiveness, we must reject Shenard's vindictiveness claim.

D.   OBSTRUCTION OF JUSTICE

Shenard finally challenges his obstruction of justice enhancement, arguing that the district court relied on a finding that it did not actually make at his plea agreement revocation hearing.  He concedes that this enhancement does not affect his sentencing range and any error was harmless unless this Court reverses on his vindictiveness claim.  Because we do not find his claim of prosecutorial vindictiveness meritorious, we agree that any error was harmless.

For the above reasons, we VACATE Loletta Scott's convictions and REMAND for further proceedings.  We AFFIRM the convictions of Rodney Wells.  Finally, we AFFIRM Shenard Wells' sentence.

25