IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-30716

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JOHN DARREN SALTZMAN,

Defendant-Appellee,

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The Government appeals the district court's dismissal of three counts of the superseding indictment in this case. The Government contends that the district court erred in concluding that the facts of this case warrant a presumption of prosecutorial vindictiveness. We hold that application of the presumption was improper, and therefore we REVERSE and REMAND.

I.

Saltzman was previously employed as a part-time Jefferson Parish Sheriff's Deputy; at that time, he acquired a .357 service revolver specially fitted with a custom barrel. On November 15, 2000, Saltzman was convicted in the Eastern District of New York of the felony of illegal transportation of an alien

and was sentenced to 15 months imprisonment. Because of the felony conviction, Saltzman was required to forfeit the .357 service revolver, however, at that time no program existed for the retrieval of weapons owned by felons.

The following events, which occurred over 5 years later, led to Saltzman being charged with the criminal counts before us today. According to the criminal complaint and factual basis, on February 27, 2006, Customs and Border Protection Officer William Brumley boarded the M/V Nurten Ana, a foreign vessel moored at the Port of New Orleans, for a security inspection. During the inspection, Brumley entered a cabin assigned to Nationwide Security ("Nationwide")[1] and observed an unsecured, loaded .357 revolver in plain view. Brumley spoke with the supervisor of Nationwide, whom said that he did not know who the weapon belonged to. Brumley then spoke with Saltzman, who identified himself as "Arthur Milonas," the general manager of Global Maritime Security,[2] a security subcontractor. Brumley asked "Milonas" for identification and asked him whether he knew the owner of the .357 revolver. According to the criminal complaint, "Milonas" responded that the weapon was his. "Milonas" was attired in black tactical gear with a police logo on his back and was carrying a 9mm handgun in a tactical thigh holster. "Milonas" then provided Brumley with a Louisiana security identification card and a Global identification card, both in the name "Arthur Milonas." At this point, Brumley recognized Saltzman from a previous encounter, and requested "Milonas" place his hands on the wall so Brumley could secure the 9mm firearm. Saltzman then grabbed the "Milonas" identification card from Brumley, left the vessel, and drove away before Brumley could secure the weapon in the thigh holster.

---

[1] Nationwide is a private security company that was responsible for the safety and security of the ship's crew and loading dock area while the ship was moored in New Orleans. Nationwide's cabin was used to secure items and as a resting area for the guards.

[2] Global Maritime Security is also referred to in the record as Global Security. For consistency, we will use "Global" or "Global Maritime Security" to refer to the company.

Subsequently, Immigration and Customs Enforcement Special Agent Ryan Maher learned that a person named "Arthur Milonas" was actually employed by Global. Maher interviewed Milonas, who said that his manager was someone known as "John Chisholm," but identified Saltzman as his supervisor from a photo array. Maher then met with Brumley, who identified Saltzman as the individual who claimed ownership of the .357 revolver. Maher also obtained a trace report from the Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center, which indicated that the weapon seized on February 27, 2006, was owned by Saltzman at that time.

On April 6, 2006, the Government filed a federal criminal complaint charging Saltzman with possession of two firearms, a Smith & Wesson .357 revolver and a 9mm Beretta handgun, after a felony conviction for illegal transportation of an alien, in violation of 18 U.S.C. § 922(g)(1). Saltzman made his initial appearance on April 17, 2006, represented by Stephen London, his counsel of choice. Because of ongoing plea negotiations, the parties jointly agreed to continue the preliminary hearing four times. On August 24, 2006, the Government filed a single count bill of information charging Saltzman with felon-in-possession of the .357 revolver in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On October 26, 2006, Saltzman appeared before the district court for rearraignment and pled guilty to the one-count bill. During the plea colloquy, Saltzman agreed to the accuracy of the factual basis supporting the bill; denied he had been induced to plead guilty by threats or coercion; agreed he had sufficient time to investigate the case and discuss defenses with counsel; expressed satisfaction with counsel; and stated he was acting of his own free will. Sentencing was set for February 15, 2007.

Three days before sentencing, on February 12, 2007, Saltzman moved to substitute attorneys, replacing London with Michael S. Fawer; to withdraw his

guilty plea; and to continue sentencing. In his motion to withdraw his guilty plea, Saltzman averred that he had "improvidently entered a guilty plea based on an inaccurate 'Factual Basis' and a false belief that a guilty plea and general plea for leniency constituted his sole means of proceeding with these charges."

In support of his motion, Saltzman set forth the following facts, which he argued demonstrated his "legal innocence." Saltzman indicated that after his 2000 felony conviction, on November 14, 2000, he sold his .357 revolver to his close friend Kevin Turner, the owner of Global. During the 2006 Mardi Gras season, Turner lacked enough armed guards to secure the Nurten Ana, so Turner contacted Saltzman and asked Saltzman to supervise the Global guards watching the Nurten Ana. Saltzman donned generic tactical apparel so that he would appear to have a position of security, placed a toy training pistol in his thigh holster, and went to the port. Saltzman contended that he did not take any firearm aboard the ship, nor did he provide anyone else on board with a firearm; rather, Turner, the legal owner of the .357 revolver, had brought the firearm to the wharf earlier that day and gave it to an employee of the security subcontractor, who probably then stored it in the common room. Saltzman contended he had never been in the common room of the Nurten Ana. With respect to his interactions with Brumley, Saltzman indicated that he had recognized Brumley as one of the officers who had arrested him in 2000, so he gave an incorrect name and identification to Brumley. Saltzman said he never claimed that he was the current owner of the .357 revolver and that he had only identified the .357 revolver as the service weapon he had previously owned. Saltzman then retrieved his identification and left the scene. Saltzman argued that he had told London, his previous counsel, that he disagreed with the factual basis and did not want to plead guilty, but that London induced him to lie under oath and plead guilty. In support of his motion, Saltzman tendered the affidavit

of Kevin Turner, a bill of sale for the .357 dated November 14, 2000, and his own affidavit.[3]

The Government opposed Saltzman's motion to withdraw his guilty plea, and on February 28, 2007, the district court held a hearing on the pending motions. The court granted the motion to withdraw the guilty plea, finding that although the factual basis may have supported a finding that Saltzman owned the .357 revolver, it was insufficient to support a finding that he possessed the revolver, as required under 18 U.S.C. § 922(g). Further, the court found that Saltzman "probably" lied in agreeing to the factual basis, and that the lying may have been prompted by his attorney. Thus, the court allowed Saltzman to withdraw his guilty plea and set the case for trial on April 2, 2007.

Subsequently, the Government filed an unopposed motion to continue the trial because the negotiated plea had been set aside, and the Government planned to present an indictment with additional violations to the federal grand jury. The district court granted this motion.

On March 22, 2007, the grand jury returned a five-count superseding indictment against Saltzman. Count one charged Saltzman with felon-in-possession of the .357 revolver on February 27, 2006, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) – the same charge contained in the original bill of information and indictment. Count two charged Saltzman with felon-in-possession of a 9mm handgun on February 27, 2006, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count three charged Saltzman with felon-in-possession of a .40 caliber Beretta handgun on December 20, 2003, in violation of 18 U.S.C.

---

[3] Saltzman's affidavit, however, only attests to the truth of Turner's affidavit. Saltzman did not submit an affidavit attesting to his version of the events, such as his contentions that the 9mm weapon was a toy, that he had never been in the common room, that he didn't claim ownership of the weapon, and that London had induced him to lie.

§§ 922(g)(1) and 924(a)(2).[4] Count four charged that Saltzman falsely represented to Brumley that he was Arthur Milonas on February 27, 2006, in violation of 18 U.S.C. § 1001(a)(2). Finally, count five charged that Saltzman used a false document when he provided Brumley with two false identifications as "Milonas," in violation of 18 U.S.C. § 1001(a)(3).

Saltzman moved to dismiss counts two through five on May 11, 2007, claiming that the Government sought the superseding indictment "as a vindictive attempt to punish him for exercising his rights to plead not guilty and demand a jury trial." Saltzman argued that the Government knew all of the facts underlying the superseding indictment at the time it made the original charging decision; that the Government resurrected unrelated charges only after Saltzman successfully moved to withdraw its guilty plea; and that such circumstances indicated vindictiveness on the part of the Government. In response, the Government contended that the one count indictment was filed as part of the negotiated plea and that the Government was permitted to file additional charges after the bargained-for result – the guilty plea – was not obtained. The Government did however indicate that it did not plan on presenting evidence on count three because, post-indictment, it had discovered contradictory evidence which did not support the charge.[5] The Government did not include any affidavits or other evidence with its opposition.

On June 6, 2007, the district court issued a written ruling granting in part and denying in part Saltzman's motion to dismiss the superseding indictment.

---

[4] The Government states that this charge arose from a review of Maher's interview with the real Arthur Milonas, who had told Maher that Saltzman had lent him a third handgun, a .40 caliber Beretta, to attend firearms training that occurred on December 20, 2003.

[5] After filing the superseding indictment, Maher reinterviewed Milonas, who stated for the first time that he did not obtain the Beretta directly from Saltzman, but from another individual who told Milonas it was from Saltzman. That individual was also interviewed, but was unable to state positively that he obtained the Beretta from Saltzman. On this basis, the Government concluded that the evidence would not support count three.

The district court made no finding of actual vindictiveness, but determined there should be a presumption of vindictiveness for the following reasons. First, Saltzman had exercised his legal right to withdraw his guilty plea, which the court permitted "because the Government's Bill of Information was egregiously defective." Second, at the time of the original indictment, the Government had completed its investigation and had full knowledge of the few facts in the case. Third, the Government's willingness to dismiss count three of the indictment, a charge unrelated to any of the conduct initially discussed in the criminal complaint, was "of concern." Fourth, the Government's decision to charge Saltzman with the misrepresentation counts, counts four and five, came directly after Saltzman's counsel conceded, in open court, that Saltzman misrepresented himself to Brumley. Fifth, none of the additional charges had been included in the original criminal complaint or indictment. Based on these factors, the court concluded that although the Government could "arguably" justify the addition of count two, the actions of the Government in charging counts three through five demonstrated a reasonable likelihood of vindictiveness. The court thus applied the presumption of vindictiveness and, concluding that the Government had failed to rebut this presumption, dismissed counts three through five.

The Government filed a motion for reconsideration, supported by a more detailed memorandum of law and documentary evidence, including a timeline of events that occurred on February 27, 2006, and investigation reports. The Government also included affidavits from Jeffrey Brown and Abram McGull, the Assistant United States Attorneys assigned to the case; Agent Maher; and Stephen London, Saltzman's former attorney. The district court denied the motion for reconsideration. The Government filed a timely appeal of the partial grant of Saltzman's motion and the denial of its motion for reconsideration.

II.

On appeal, the Government argues that the district court erred in applying the presumption of vindictiveness in the present case. We review a district court's factual findings concerning prosecutorial vindictiveness for clear error and its legal determinations de novo. See United States v. Johnson, 91 F.3d 695, 698 (5th Cir. 1996).

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" United States v. Goodwin, 457 U.S. 368, 372 (1982) (citing Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)). Thus, a prosecutor may not increase the charge against a defendant solely as a penalty for invoking a right, such as pursuing an appeal. See, e.g., United States v. Krezdorn, 718 F.2d 1360, 1362-65 (5th Cir. 1983) (en banc). The defendant has the burden of proving, by a preponderance of the evidence, prosecutorial vindictiveness. Id. at 1365. In general, there are two ways in which a defendant can prove a claim of vindictiveness. First, a defendant may prove actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. See Goodwin, 457 U.S. at 384 & n.19; Johnson, 91 F.3d at 698. Second, in certain circumstances, a defendant may show sufficient facts to give rise to a presumption of vindictiveness. Goodwin, 457 U.S. at 374; Krezdorn, 718 F.2d at 1365.

Here, the district court determined that it was appropriate to apply the presumption of vindictiveness. The presumption of vindictiveness is a prophylactic rule designed to protect a defendant's due process rights where a danger exists that the government might retaliate against him for exercising a legal right. See Bordenkircher, 434 U.S. at 363. The Court first applied this presumption in North Carolina v. Pearce, 395 U.S. 711, 725 (1969). In that case the Court held that the Due Process Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully

attacked his first conviction must play no part in the sentence he receives after a new trial." Id. To ensure the absence of such a motivation, the Court applied a presumption of vindictiveness, which may only be overcome by objective evidence in the record justifying the increased sentence. Id. at 726. Subsequently, in Blackledge v. Perry, 417 U.S. 21, 22-23, 28-29 (1974), the Court applied the presumption of vindictiveness where the prosecutor filed additional charges after the defendant exercised his right to a de novo trial for his misdemeanor conviction. The Court held that the opportunities for vindictiveness in the situation before it were such "as to impel the conclusion that due process of law requires a rule analogous to that of the Pearce case." Id. at 27.

However, because such a presumption "may operate in the absence of any proof of an improper motive," Goodwin, 457 U.S. at 373, courts will apply it only where there exists a "realistic likelihood of 'vindictiveness.'" Blackledge, 417 U.S. at 27. To determine whether the presumption of vindictiveness applies, "the court must examine the prosecutor's actions in the context of the entire proceedings." Krezdorn, 718 F.2d at 1365. There is no presumption of vindictiveness if in the context of the entire proceedings "any objective event or combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision . . . was motivated by some purpose other than a vindictive desire to deter or punish appeals." United States v. Wells, 262 F.3d 455, 466-67 (5th Cir. 2001) (quoting Krezdorn, 718 F.2d at 1365). Even if a defendant establishes a realistic likelihood of vindictiveness, however, the government still has an opportunity to proffer legitimate, objective reasons for its conduct. See Goodwin, 457 U.S. at 374; Krezdorn, 718 F.2d at 1365.

Further, the inquiry into prosecutorial conduct in a pretrial context may be distinguished from conduct occurring thereafter.

For example, in Bordenkircher, 434 U.S. at 358, the Court for the first time considered an allegation of vindictiveness arising in a pretrial setting. In that case, the Court held that the Due Process Clause of the Fourteenth Amendment did not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refused to plead guilty to the offense with which he was originally charged. Id. at 365. It was not disputed that the additional charge was justified by the evidence, that the prosecutor was in possession of this evidence at the time the original indictment was obtained, and that the prosecutor sought the additional charge because of the accused's refusal to plead guilty to the original charge. Id. at 359. In finding no due process violation, the Court in Bordenkircher distinguished the decisions in Pearce and Blackledge, stating:

> In those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction – a situation "very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power."

434 U.S. at 362 (quoting Parker v. North Carolina, 397 U.S. 790, 809 (1970)). Because the prosecution has a constitutionally legitimate interest in persuading the defendant not to exercise his right to plead not guilty, the presumption of vindictiveness was not warranted where the prosecution had done no more than "openly present[] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." Id. at 365.

Subsequently, in Goodwin, the Court considered whether to apply a presumption of vindictiveness when the prosecutor indicted the defendant on a felony charge after the defendant declined to plead guilty and requested a jury trial on a misdemeanor charge. 457 U.S. at 370. In that case, the Court noted that "there is good reason to be cautious before adopting an inflexible

presumption of prosecutorial vindictiveness in a pretrial setting." Id. at 381. First, although a prosecutor's assessment of the evidence may be in flux prior to trial, once a trial begins "it is much more likely that the State has discovered and assessed all the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted." Id. "Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." Id. Second, prior to trial, a defendant is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor; "[i]t is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." Id. Finally, the timing of a prosecutor's action is relevant and "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." Id. at 381-82. Therefore, the Court concluded that "[t]he possibility that a prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges not in the public interest that could be explained only as a penalty imposed on the defendant is so unlikely that a presumption of vindictiveness certainly is not warranted." Id. at 384.

The only feature distinguishing this case from Bordenkircher and Goodwin is that rather than refusing to plead guilty, Saltzman did plead, but then succeeded in withdrawing his plea before the superseding indictment was filed. Thus, it is allegedly the withdrawal of the plea, not the refusal to enter a plea that prompted the additional charges. We see no distinction between a defendant's refusal to plead guilty and a defendant's successful withdrawal of a guilty plea sufficient to warrant the imposition of a presumption of vindictiveness in the latter case. In both circumstances the defendant has, in essence, refused the Government's offer of a plea and exercised his right to force

the Government to prove its case. Goodwin clearly held that such a circumstance is "insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." Id. at 382-83. Here, an objective event – Saltzman's successful withdrawal of his guilty plea – "should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of charges was motivated by some purpose other than a vindictive desire to deter or punish." Krezdorn, 718 F.2d at 1365; Goodwin, 457 U.S. at 382-83 ("[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified."); cf. Wells, 262 at 467 (holding that vacatur of plea agreement is an "objective event" that should have indicated that the government's decision to increase the charges was motivated by some purpose other than a vindictive desire to punish him for exercising his right to trial).

In reaching its conclusion that the presumption should apply, the district court relied heavily on the fact that at the time of the original indictment, the Government had full knowledge of the facts in the case, but did not include any of the additional charges in the original criminal complaint or indictment. However, both Bordenkircher and Goodwin rejected this factor as relevant because "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." Goodwin, 457 U.S. at 382. The Court explained:

> Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation – in often what is clearly a "benefit" to the defendant – changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial "vindictiveness." An initial indictment – from which the prosecutor embarks on a course of plea negotiation – does not necessarily define the extent of the legitimate interest

> in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.

Goodwin, 457 U.S. at 379-80; see also Bordenkircher, 434 U.S. at 364-65 ("To hold that the prosecutor's desire to induce a guilty plea . . . may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself."); United States v. Molina-Iguado, 894 F.2d 1452, 1455 (5th Cir. 1990).

The district court also found significant the Government's decision to charge Saltzman with the misrepresentation counts directly after Saltzman's counsel conceded, in open court, that Saltzman misrepresented himself to Brumley. However, as the Goodwin Court indicated: "In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance." 457 U.S. at 381. Thus, while it is possible that counsel's concessions influenced the prosecutor's charging decision on the misrepresentation counts, "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." Id. at 382.

The district court and Saltzman rely on United States v. Meyer, 810 F.2d 1242 (D.C. Cir. 1987). In that case, two hundred political demonstrators were arrested outside of the White House. Although many demonstrators elected to plead guilty and pay a $50 fine, some elected to proceed to trial. Id. at 1244. The Government then filed an additional count of obstructing the sidewalks against every defendant who elected to proceed to trial. Id. Counsel for defendants moved to dismiss the superseding indictment on the ground of vindictive prosecution. Id. Although the Government moved to dismiss the

additional count at the vindictiveness hearing, the trial court dismissed the entire indictment on the ground of vindictive prosecution. Id. The D.C. Circuit concluded that the defendants presented evidence allowing the imposition of the presumption of vindictiveness. Id. at 1246. The court concluded that defendants showed that all of the circumstances, presented together, supported a realistic likelihood of vindictiveness. Id. Primarily, the court relied on the Government's disparate treatment of every defendant who elected to proceed to trial, explaining that "[t]his disparate treatment must give rise to a suspicion that the government discriminated among the defendants on the basis of their divergent decisions whether to exercise their right to trial." Id. The court also noted the "simplicity and clarity of both the facts and law underlying these prosecutions" and found suspicious the Government's willingness to drop the additional charge at the hearing. Id. at 1246-47. Finally, the court considered the government's motive to act vindictively. Id. at 1247. Unlike a routine individual prosecution, "[t]he government had a strong incentive to try to keep clear of this courtroom morass: it wished to avoid the annoyance and expense of prosecuting these minor cases at a potentially drawn-out trial." Id.

Saltzman argues that his case is factually indistinguishable from Meyer. We disagree. It is clear that the Meyer court's application of the presumption of vindictiveness was based, in large part, on the fact that the government decided to bring the additional charge against every member of a group of defendants that chose to proceed to trial. This disparate treatment rendered inapplicable much of the Goodwin court's discussion regarding an individual prosecutor's exercise of discretion. Further, the large number of defendants threatening to go to trial on petty offenses created a strong incentive for the prosecutor to discourage the assertion of legal rights. Neither of these two factors is present here. Saltzman argues that, like the prosecutor in Meyer, the prosecutor here has offered to drop one of the charges in the superseding indictment. However,

14

in Meyer, the prosecution's willingness to drop the charge was relevant because the trial court had granted the defendants a jury trial on the basis of the enhanced charges. Thus, it appeared that the prosecution wished to drop the charges only to prevent defendants from invoking their right to a jury trial, not for any legitimate reason, such as a lack of evidence to support the charge. Here, in contrast, there would be no such benefit to the prosecution for dropping the third charge and nothing to indicate that the prosecutor was not acting in good faith in refusing to pursue the third charge.

We acknowledge that the district court's task in this case was made significantly more difficult by the Government's failure to provide any evidence whatsoever with its opposition to Saltzman's motion. As the district court properly recognized, it was required to "examine the prosecutor's actions in the context of the entire proceedings" to determine whether the defendant demonstrated a realistic likelihood of vindictiveness. In its motion for reconsideration, the Government attached affidavits from the prosecutors, investigatory reports, and timelines, all of which would have been eminently useful to the district court in making its initial assessment of Saltzman's motion.

Nonetheless, even considering only the facts before the district court at the time of Saltzman's motion, we must conclude that Saltzman failed to demonstrate a reasonable likelihood of vindictiveness. Saltzman showed that the prosecutor increased the charges against him after he asserted his right to withdraw his guilty plea and proceed to trial. Goodwin, however, makes clear that such facts, standing alone, are insufficient to justify the application of the presumption of vindictiveness. Further, Saltzman has not presented any additional facts sufficient to show a realistic likelihood of vindictiveness, nor has he demonstrated that there was anything sufficiently unusual in the history of this particular case to distinguish it from Goodwin. We conclude that the instant case fits within the parameters of Bordenkircher and Goodwin.

Therefore, the district court erred in applying the presumption of vindictiveness in the present case. See United States v. Barner, 441 F.3d 1310, 1319 (11th Cir. Ga. 2006) (refusing to apply presumption where prosecution obtained superseding indictment containing additional counts after defendant withdrew his guilty plea); United States v. Yarbough, 55 F.3d 280, 283 (7th Cir. 1995) (no presumption of vindictiveness where prosecutor filed six additional counts after defendant withdrew his guilty plea); United States v. Cooks, 52 F.3d 101, 105-06 (5th Cir. 1995) (presumption does not apply where government sought career offender sentencing enhancement after withdrawal of guilty plea).

Because the presumption of vindictiveness therefore does not apply to charges three, four, and five of the superseding indictment, Saltzman was required to show that the Government's charging decision was motivated by actual vindictiveness. See Wasman v. United States, 468 U.S. 559, 569 (1984). To prove actual vindictiveness, Saltzman must present objective evidence that the government acted solely to punish him for exercising his legal rights, and that the reasons proffered by the government are pretextual. United States v. Dorsey, 512 F.3d 1321, 1325-26 (11th Cir. Fla. 2008); see also United States v. Johnson, 221 F.3d 83, 94 (2nd Cir. 2000) (A finding of "actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor . . . ."). Although Saltzman appears to claim that evidence of actual vindictiveness exists in the record, Saltzman has failed to present any such evidence. Therefore, Saltzman's vindictive prosecution claim must fail.

### III.

In conclusion, we find that the district court erred in applying the presumption of vindictiveness. Therefore, we REVERSE and REMAND.