**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 00-11292**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**ALFRED E. BREMERS,**

**Defendant-Appellant.**

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(4:97-CR-111-1-R)**

November 21, 2002

Before HIGGINBOTHAM, JONES, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

For Alfred E. Bremers' appeal from his convictions for mail fraud and interstate transportation of stolen securities, primarily at issue is whether reversible plain error occurred because of the Government's repeated misrepresentation of a consent injunction against Bremers. **AFFIRMED.**

I.

In 1990, Bremers, along with Snearly, Fields, Cox, and others, formed Tekna Synergy Corporation to conduct oil and gas

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

exploration.  Fields served as Tekna's president; Bremers, as vice president in charge of field operations; and Cox, as both vice president of Tekna and president of InvestAmerica Financial Services, a broker-dealer Tekna acquired to solicit investments in Tekna's exploration programs.

InvestAmerica brokers contacted, by telephone, high income or net worth individuals, as well as previous investors in oil and gas ventures.  Although Bremers was primarily responsible for Tekna's field operations, he helped train InvestAmerica's telephone brokers and made telephone calls to potential investors.

If a contacted-person expressed interest in investing, InvestAmerica would provide a private placement memorandum (PPM), which pertained to particular drilling programs offered by Tekna; each was tied to a particular well or wells.  PPMs contained, *inter alia*, corporate information, disclosures, geological information, and investment documents.

InvestAmerica brokers misrepresented to potential investors that Tekna had leases on certain drilling locations; PPMs and attachments had misrepresentations concerning, *inter alia*, the composition of Tekna's "Advisory Board", certain wells' production history, and existing wells' production status; pamphlets regarding the Securities Investors Protection Corporation were provided investors, even though Tekna's programs and investments in them

2

were not covered by SIPC insurance; and Bremers, by telephone, gave false information to potential investors regarding well production.

Prior to Tekna's formation, a consent injunction had been obtained by the Securities and Exchange Commission against Bremers (1986). It followed the SEC's investigation of Bremers' former company, InterAmerica Minerals, Inc., and essentially prohibits Bremers (as well as his officers, agents, employees, etc.) from violating: Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), (c) (prohibiting use of interstate commerce and the mails in the sale, delivery, or offer to sell or buy *non-exempted* securities, without first meeting certain registration/filing requirements); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77(q)(a) (prohibiting use of interstate commerce and the mails for purposes of fraud or deceit in the offer or sale of securities); and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5 (prohibiting use of interstate commerce or the mails for purposes of fraud or deceit in connection with the purchase or sale of securities).

The disclosures in the PPMs about the injunction were generally consistent with the following:

> [P]rimarily as the result of the downturn in the oil industry and the corresponding rapid decline in oil prices, and regulatory proceedings and civil litigation instituted against Mr. Bremers, InterAmerica Minerals and several significant customers, Mr. Bremers

> consented to the SEC entering a final Judgment and Order of Permanent Injunction on January 13, 1986, prohibiting violations of federal securities laws....

The Government charged: misrepresentations through, *inter alia*, fallacious status reports, continued after Tekna had attracted investment; Bremers approved a "Ponzi" scheme whereby investors were sent "revenue checks" drawn on an account containing funds raised from other investors; and Snearly formed TM Corporation, which received part of the investments raised by Tekna, to be shared by Bremers, Snearly, and Cox.

Tekna filed for bankruptcy. Bremers, along with Cox, Snearly, and Stewart, another Tekna officer, were indicted in September 1997 for mail fraud, interstate transportation of stolen securities pursuant to a scheme to defraud, and money laundering.

Cox pleaded guilty to a single count of interstate transportation of stolen securities and cooperated with the Government. The remaining defendants were found guilty in a jury trial in 1998. Bremers, charged in 21 counts, was convicted on all but three, which the Government had waived during trial.

The convictions were vacated because the district judge erred in not recusing himself. ***United States v. Bremers***, 195 F.3d 221, 229 (5th Cir. 1999).

On remand, Snearly and Stewart pleaded guilty to reduced charges. In 2000, Bremers was convicted on two counts of mail fraud, in violation of 18 U.S.C. §§ 1341 & 2, and five counts of

4

interstate transportation of stolen securities pursuant to a scheme to defraud, in violation of 18 U.S.C. §§ 2314 & 2.  He was sentenced to, *inter alia*, 70 months imprisonment.

II.

At issue are:  whether the Government's misrepresentations about the consent injunction constitute reversible plain error; whether a fatal variance existed between the indictment and proof for the interstate-transportation-of-stolen-securities counts; and whether the admission of an unavailable witness' prior testimony violated the Confrontation Clause.

A.

Bremers contends the Government violated his Fifth and Sixth Amendment rights to due process and a fair trial by misrepresenting the terms of the consent injunction, to wit:  that it prohibited him from engaging in *any* sale of unregistered securities and he consequently committed fraud by not disclosing this to investors; and that it constituted evidence of past fraud and suggested Bremers, for purposes of this case, acted in conformity with that behavior.

At trial, however, Bremers did not object to these claimed misrepresentations.  When a party forfeits legal error by failing to object, our review is sharply limited by the plain error standard.  *E.g.*, **United States v. Calverley**, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1196 (1995).  We

5

may only correct "clear" or "obvious" error that affects substantial rights. *See **United States v. Olano***, 507 U.S. 725, 734 (1993); ***Calverley***, 37 F.3d at 162-64. Even then, we retain discretion whether to correct it. ***Olano***, 507 U.S. at 732. Generally, we will do so only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings". ***Id.*** (quoting ***United States v. Young***, 470 U.S. 1, 15 (1985)).

Throughout trial, the Government misrepresented the injunction's terms. For example, in its opening statement, it said Bremers "was permanently enjoined not to market oil and gas securities if th[ey] were *not* registered with the SEC". (Emphasis added.) The portion of the injunction prohibiting use of interstate commerce and the mails in the offering and sale of unregistered securities, however, is *expressly inapplicable* to transactions *exempt* from the provisions of Section 5 of the Securities Act of 1933, *e.g.*, "transactions by an issuer not involving any public offering". 15 U.S.C. § 77d(2). Restated, the injunction prohibits the *public* sale of unregistered securities. Tekna's were *privately* offered.

The Government repeated this error in questioning several witnesses, asking: Cox, "[The PPM disclosure statement] does not tell investors that a court has ordered [Bremers] to refrain from involving in any marketing of oil and gas interests unless they register with the SEC, does it?" (negative response); an

6

InvestAmerica broker, "As a part of the [marketing] presentation, did you ever disclose to investors that there had been a court order issued against ... Bremers prohibiting him marketing unregistered oil and gas securities?" (negative response); an investor, "Did they tell you that the people involved in this were under permanent[] injunction in the sale of securities?" (negative response); Bremers' wife, "Were you there when ... the order [was signed] permanently barring your husband from selling oil and gas unregistered securities because of fraud?" (negative response); Fields, "You would agree this injunction ... prohibits Mr. Bremers from ... making use of any means or instruments [of] transportation or communication in interstate commerce or the mails to sell any security in the form of fractional undivided oil and gas leases. Is that true?" (affirmative response); and Tekna employee Norton, "Were you aware[,] when you worked for Mr. Bremers at Tekna, ... that he was under an injunction not to sell oil and gas wells? ... I should say interest in oil and gas wells." (affirmative response).

Bremers also complains about the Government's questioning Tekna attorney Ramsey Slugg: "Let me make sure I'm clear. The securities that Tekna was issuing are subject to this injunction." (affirmative response). Tekna's securities were not subject to the injunction's prohibition on the *public* offering of unregistered securities. They *were*, however, subject to its prohibition on use

of interstate commerce for purposes of fraud or deceit in the offer or sale of securities.

During closing argument, discussing the PPM disclosures, the Government asserted:

> [The injunction] prohibits [Bremers] from selling or — himself or in concert with others, selling interests in oil and gas wells. And by his own witness'[s] testimony, Ramsey Slugg, that's exactly — that's exactly what they were selling through these brochures.... And I ask you — here's the simple question. Does the language in these brochures ever disclose, ever disclose anything remotely similar to the fact that he's been prohibited from doing exactly what he was doing[?]

In its closing argument rebuttal, and despite the injunction's providing that Bremers neither admitted nor denied the allegations in the SEC's 1986 complaint, the Government arguably implied the injunction was proof of earlier misconduct and character evidence to show conformity therewith:

> Now, from the very first program[,] ... we also know that Mr. Bremers was resorting to old forms and old styles.... And the SEC couldn't get his attention back in 1986 because you know he drifted right back to Tekna and the same old form.

Similarly, in the final part of its rebuttal, the Government argued:

> We also know that he's run afoul of the SEC before. He's smart enough to know exactly [how] to avoid this. And not one iota of admission for responsibility, everything was just fine. It was somebody else's fault. That type of individual constitutes a very

8

> real danger, an economic danger to people out
> there.
>
> The SEC didn't get his attention.  It's
> time somebody does.

For the most part, the Government appears to concede the above-noted references constitute error.  It maintains, however, that the closing argument remarks were permissible because either they were too ambiguous to constitute a Rule 404(b) violation or were permissible to prove "preparation, plan, [or] knowledge".  (Rule 404(b) prohibits admission of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith", but permits such evidence for other purposes — *e.g.*, proof of preparation, plan, or knowledge. FED. R. EVID. 404(b).)

Assuming these references amounted to clear or obvious error, the error must also affect substantial rights.  "To satisfy [that] requirement ..., the appellant must generally 'make a specific showing of prejudice' — that is, the error 'must have affected the outcome of the district court proceedings.'"  ***United States v. Avants***, 278 F.3d 510, 521 (5th Cir.) (quoting ***Olano***, 507 U.S. at 734-35), *cert. denied*, 122 S. Ct. 2683 (2002).  "*The burden of persuasion lies with the defendant*.  Absent a showing that a substantial right has been compromised, no remedy is available." ***Calverley***, 37 F.3d at 164 (emphasis added).

Bremers adequately discusses the nature of the Government's errors; but, he fails to show how they affected his substantial rights.  He states, conclusionally:  "The strong prejudice to Mr. Bremers is easily shown by the [G]overnment's reliance on the error, from the opening statement to the very last words in closing".

Bremers cannot demonstrate prejudice simply by illustrating the error's frequency; again, he must demonstrate it *affected the outcome*.  In that vein, he generally asserts that the remaining "evidence of a scheme to defraud was by no means overwhelming" and that "guilt or innocence in this case was closely contested".  This does not satisfy his burden.

The indictment charged Bremers with a scheme to defraud.

> In mail fraud cases the government need not prove every allegation of fraudulent activities appearing in the indictment.  It need only prove a sufficient number of fraudulent activities to support a jury inference that there was a fraudulent scheme. Failure of the government to prove one or more of its allegations is not necessarily fatal to the government's case....

*United States v. Toney*, 598 F.2d 1349, 1355-56 (5th Cir. 1979), *cert. denied*, 444 U.S. 1033 (1980); *see also* **United States v. Davis**, 752 F.2d 963, 970 (5th Cir. 1985) (same).

As the Government points out, the claimed misleading disclosure about Bremers' injunction was only one of *many* fraudulent, material representations claimed to have been made in

10

the course of the scheme to defraud. Also alleged were fraudulent representations regarding, *inter alia*: identities of Tekna advisors, ownership of well leases, well production history, and well viability.

Substantial evidence supported these allegations, including, *inter alia*: testimony from Tekna-affiliated personnel who observed Bremers, by telephone, misrepresent well productivity to investors; letters from Bremers to investors exaggerating the productivity of certain wells; testimony from a petroleum geologist falsely listed in PPM attachments as a member of Tekna's "Advisory Board"; testimony from Cox that investors were falsely informed of, and charged for, new wells being drilled, when instead existing wells were being reentered; testimony from an InvestAmerica broker that Bremers provided him misinformation to relay to an investor — that what was actually a dry hole was "not a dry hole [and] that it was going to be a very good well"; and testimony from an InvestAmerica broker that Bremers would suggest ways to present and market Tekna programs, but would preface such suggestions with, "you did not hear the information from me".

Bremers notes some of this evidence was contested or disputed; but, he has not met his burden of establishing that, but for the Government's misrepresentations regarding the injunction, he would not have been convicted.

11

Bremers labels his next claim a challenge to the evidence sufficiency for counts eight through 12 (interstate transportation of stolen securities). More accurately, it is a claim of variance between the indictment and the evidence: Bremers does not contend the evidence was insufficient to prove the *statutory* elements; rather, and as discussed *infra*, he maintains the evidence does not support the wording of the *indictment*. "A variance between the wording of an indictment and the evidence presented at trial is fatal only if 'it is material and prejudices ... [the defendant's] substantial rights.'" **United States v. Sprick**, 233 F.3d 845, 853 (5th Cir. 2000) (alteration in original; quoting **United States v. Mikolajczyk**, 137 F.3d 237, 243 (5th Cir. 1998)).

Bremers maintains he preserved this issue for review with acquittal motions at the close of both the Government's case and all the evidence. There is, however, no record of the *substance* of those motions. We question whether a general motion for acquittal can preserve a variance, as opposed to an evidence insufficiency, claim. We need not decide this issue; even if preserved, the claim fails.

Section 2314 prohibits, *inter alia*, the transportation "in interstate ... commerce [of] any ... securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud". 18 U.S.C. § 2314. The elements of

such violation are: "(1) the interstate transportation of; (2) goods, merchandise, wares, money, or securities valued at $5,000 or more; (3) with knowledge that such items 'have been stolen, converted, or taken by fraud'". *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002) (quoting 18 U.S.C. § 2314).

"[I]t is not necessary to show that [a defendant] actually ... transported anything [himself]", *Pereira v. United States*, 347 U.S. 1, 8 (1954), because "*causing* interstate transportation is made a crime under ... § 2314". *Hubsch v. United States*, 256 F.2d 820, 822 (5th Cir. 1958) (emphasis added). Nor is actual knowledge of interstate transportation necessary. *See* *United States v. Mitchell*, 588 F.2d 481, 483 (5th Cir.) ("Because the interstate element is only included to provide a constitutional basis for the exercise of federal jurisdiction, it is not necessary to show actual knowledge by [the defendant] of the interstate transportation of the security."), *cert. denied*, 442 U.S. 940 (1979).

Counts eight through 12 allege Bremers

> knowingly transported and caused to be transported in interstate commerce from [another State] to ... Texas, [a] security having a value of more than $5,000 ..., *and at the time, ...* knew the said security was stolen, converted and taken pursuant to the scheme to defraud alleged in the indictment.

(Emphasis added.) In this light, Bremers contends the Government was required to prove: *at the time each security (investor's*

13

*check) crossed the Texas state line*, he knew of its existence and that it was stolen.

To the extent any variance exists between the indictment and the proof, Bremers has made *no* attempt to demonstrate how it was material or prejudicial to his substantial rights.

C.

Finally, Bremers bases error on the district court's admitting, in lieu of Gerstner's live testimony, a transcript of his testimony at Bremers' *first* trial. The district court concluded Gerstner was unavailable to testify in the light of: a physician's letter that Gerstner had a herniated disk, which the district court characterized as a "medical problem"; and the considerable distance Gerstner would have to travel to testify (San Antonio to Dallas). "We review the district court's decision to allow admission of evidence for abuse of discretion." *United States v. Wells*, 262 F.3d 455, 459 (5th Cir. 2001).

The Government offered the transcript pursuant to Rule 804(b), which provides, in part:

> The following are not excluded by the hearsay rule if the declarant is *unavailable as a witness*:
>
> (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding ... *if* the party against whom the testimony is now offered ... had an *opportunity and similar motive* to develop the testimony by direct, cross, or redirect examination.

14

(Emphasis added.) "'Unavailability as a witness' includes situations in which the declarant ... is unable to be present or to testify at the hearing because of ... then existing physical ... infirmity". FED. R. EVID. 804(a)(4).

Along those lines, "the traditional common law hearsay exception allowing use of prior testimony of a witness once subject to cross-examination, if the witness is unavailable, also applies in the Confrontation Clause context". *Ecker v. Scott*, 69 F.3d 69, 71 (5th Cir. 1995) (citing *Ohio v. Roberts*, 448 U.S. 56 (1980)).

Bremers maintains: Gerstner was not unavailable; and admission of his prior testimony violated Bremers' Confrontation Clause rights. At trial, Bremers objected on Rule 804 grounds ("Your Honor, just for the record[,] I would object and say this doesn't constitute being [un]available under the record and *the rule*". (Emphasis added.)). He did *not* object on Confrontation Clause grounds. In the light of the similarity of purpose between the Clause and the Rule, as well as the similarity in our case law's treatment of each, *see Ecker*, 69 F.3d at 72 n.3, we assume Bremers preserved the Confrontation Clause issue.

"[T]he district court should engage in a multifactored analysis when deciding whether a witness's illness is sufficiently grave to allow use of prior testimony". *Id.* at 72. Those factors include: "[t]he importance of the absent witness for the case; the nature and extent of the cross-examination in the earlier

15

testimony; the nature of the illness; the expected time of recovery; the reliability of the evidence of the probable duration of the illness; and any special circumstances counseling against delay". *Id.* (quoting *United States v. Faison*, 679 F.2d 292 (3d Cir. 1982)).

A herniated disk (aggravated by the hardship of traveling almost 300 miles) may not seem overly incapacitating; but, that is not the end of our inquiry. "The most important of the [above-mentioned] factors are the first two", *id.*: the importance of the absent witness and the nature/extent of the earlier cross-examination.

Regarding the former, "[a] trial court deciding whether to allow use of prior testimony should carefully consider the role a particular witness plays in the prosecution's case, especially in light of the defense's trial strategy". *Id.* Gerstner was by no means crucial to the Government's case. He testified: he heard Bremers misrepresent well productivity to investors; and, when questioned about it, Bremers acknowledged "embellish[ing] the truth". But, as Bremers concedes, that testimony was largely similar to testimony of another Government witness — Wynne, a drilling contractor. Needless to say, "[t]estimony providing *cumulative* evidence ... might be admitted more readily than testimony not sharing th[is] characteristic[]". *Id.* (emphasis added).

16

Bremers maintains that admission of Gerstner's testimony eviscerated his trial strategy — "to prove he was an honest, trustworthy, straight shooter, who was not even involved in the sales part of the business". Gerstner's testimony, however, was merely but one piece in the Government's otherwise substantial case against Bremers.

Regarding the second factor, Bremers' first trial involved the *same charges* as the second trial. Accordingly, Bremers had the same *opportunity and motive* to cross-examine Gerstner at the first trial and did so. Bremers complains that portions of Gerstner's testimony helpful to his case were not read to the jury in the second trial. But, as the Government notes, he did not object to that omission.

The remaining factors are either neutral or militate against admission of Gerstner's testimony. Nevertheless,

> [i]n the final analysis, the decision of whether a witness is unavailable for Confrontation Clause purposes requires an exercise of a trial court's sound discretion, considering the possibility of a continuance in light of the Confrontation Clause's interest in live testimony together with the state and the defendant's joint interest in a prompt resolution of the criminal charges.

*Id.* The district court did not abuse that discretion.

III.

For the foregoing reasons, the judgment is

*AFFIRMED.*

17

*Patrick E. Higginbotham, Circuit Judge, dissenting:*

*Alfred Bremers was charged with securities fraud. The government offered evidence sufficient to support a guilty verdict. That is the beginning, not the end of the story in this criminal case – because Alfred Bremers had an arguable defense that the government effectively took from him.*

*It was the burden of the prosecution to persuade the jury that Bremers acted with criminal intent in the sale of securities – here fractional interests in oil and gas drilling ventures. The government, however, was not content to rest on the conduct charged. Rather, it set out to put before the jury that Bremers had done this before. And even more, that he had been enjoined from doing it again by Judge Eldon Mahon, a revered figure in Fort Worth and longtime federal trial judge.[2]*

*The government charged a failure to fully disclose this fifteen-year-old consent decree as part of the overarching fraudulent scheme from which the individual counts trailed. In doing so, the government seriously misstated the consent decree, turning a decree in which Bremers explicitly admitted no wrongdoing*

---

[2] The government's cross of Bremers' wife is an example: "Were you there when Judge Eldon B. Mahon signed the order permanently barring your husband from selling oil and gas unregulated securities because of fraud?" And again, the prosecutor accented that it was Judge Mahon who entered the injunction. "Before we move on, if you would, Rob, scroll down to the very end of this order, page 10. And it is entered on 4th day of March, 1986 by United States District Judge, Eldon B. Mahon."

*and only agreed to obey the law, into a direct order of Judge Mahon that Bremers was not to engage in sales activity. The government pointed to the decree's language enjoining Bremers from participating in the sale of fractional interests, without a registration statement on file, omitting the later qualifying language that its prohibition did not apply to private placements. Ironically, the government here charges a failure to disclose a reach of the decree that it now concedes it did not have.*

*Whether this was simply a large mistake as the government now urges or a deliberate tactic, we do not know. The explanation that it misunderstood the decree would be rejected out of hand except for the extraordinary circumstance that the public defender was also oblivious to the true character of the decree – "just missed it" is the present explanation.*

*So everyone, I can accept, tried this securities case ignorant of the basics of the most common of SEC consent decrees. That it was a mistake does not speak to its impact at trial; it does not mean that this criminal defendant received a fair trial. To the contrary, the use of the decree rendered Alfred Bremers' trial fundamentally unfair.*

*Make no mistake about this, the government at trial had a very different view of the importance of the consent decree to its case than does its appellate counsel. The prosecution challenged in the*

20

*indictment the adequacy of Bremers' disclosure of the consent decree to potential investors. The prosecution rolled out the consent decree in its opening statement, and repeatedly trotted it out in examining witnesses. Finally, it was the first document the government turned to in its closing statement.[3] With deference*

---

[3] The public defender's brief makes the following unchallenged statements:

In opening statement, the prosecutor stated the jury would hear that Mr. Bremers 'called the shots' with regard to both the production and the sales division, and that investors did not know that Mr. Bremers 'was permanently enjoined not to market oil and gas securities if that [sic] were not registered with the SEC.' [It is, of course, the government's statement that is not true.]

The government got the first witness to testify that the injunction precluded Mr. Bremers from participating in sales of oil and gas securities. The next witness testified that the securities were not registered, which was relevant only to the government's mistaken point that the sale of the securities was in violation of the injunction.

Paige Hendricks was called to prove Mr. Bremers was involved in sales by proving his involvement in the production of the documents used to market the well. Robert Style, a broker, testified that Mr. Bremers was involved in the sales operations.

Roger Owen, another broker, testified that he never told the investors that there was an injunction prohibiting Mr. Bremers from participating in the sales of oil and gas interests, though he used the offering documents prepared by Mr. Bremers. Norman Greenfield, an investor, testified that Mr. Bremers was involved in marketing. H.T. Christman, an investor, testified that he was never told that Mr. Bremers was under a permanent injunction not to sell oil and gas securities. Steve Fedorko, an investor, testified that Mr. Bremers was involved in sales.

21

*to my colleagues, I cannot agree that the doctrine of plain error saves this conviction.*

*To my eyes, the "errors" were plain and rendered this trial fundamentally unfair. The erroneous presentation of the consent decree was both a mistaken statement of what had occurred, a historical fact, and a misstatement of the law to the jury – by the prosecution, by the judge, and even by the "defense." All this in a government case in which the jury returned a guilty verdict in only seven of twenty-one counts and the defendant believed enough in the oil prospects to personally put his daughter's college fund at risk – it was lost along with the investors' money with the failure to obtain production – and where much of the government's direct evidence came from a lawyer, its lead witness, who had pled out in the case.*

---

Bernice Norton testified that Mr. Bremers was enjoined from selling oil and gas interests. The coup-de-grace was inflicted when the government had Mr. Bremers's own securities attorney to testify that Mr. Bremers was enjoined from being involved in the sales of these securities, and that Mr. Bremers knew this.

The government does not dispute that in final argument the prosecution argued to the jury that the injunction had prohibited Mr. Bremers from selling interests in oil gas wells, that his failure to disclose this was one of the lies that was easy to prove, that the very fact that Mr. Bremer's was involved in TEKNA was proof of his guilt, and that if Mr. Bremers was in any involved in sales, he was guilty of the charges.

22

*To be sure, there was plenty of evidence that investors were not told all they should have been told. More precisely, there was sufficient evidence to support a verdict that Bremers played a role in a fraudulent scheme. His ever optimistic reports from the drilling sites may well alone provide sufficient evidence to sustain the verdict. But that he had not been a player in these failed ventures was not his defense. His defense rested on persuading the jury that there was a reasonable doubt that he had acted with criminal intent; that he was the field man not the office man, and the filings were prepared by a lawyer who worked directly for the enterprise as well as outside counsel engaged as specialists in securities law; that his enthusiasm, while in retrospect unwarranted, was not infected by criminal purpose because he also was its victim.*

*In short, that there is otherwise sufficient evidence and the use of the decree was harmless isn't an adequate response to this set of errors that ran the full course of trial, with their palpable impact upon honest triers of fact. I cannot escape the reality that telling the jury that the defendant is an adjudicated cheat – he had done it all before – sweeps away the defense of no criminal intent. The determined use of the evidence compels both the conclusion that the prosecutors believed it would have precisely that effect and their judgment that the evidence was*

23

*necessary to its case. This alone is a large step toward a conclusion that there is a reasonable likelihood that the outcome would have been different without the use made of the decree.*

*Early in the trial defense counsel asked Ramsey Slugg, the outside securities lawyer, what the failure of the SEC to seek enforcement of the injunction meant:*

> *Question: And that leads you to believe that what?*
>
> *Answer: That they didn't feel there was a problem with – Mr. Bremers' activities were in violation of that injunction or they would have gone that route which would have been much easier.*

*The prosecutor was not content to leave this indisputably correct statement by its own witness alone. To the contrary, the questions on redirect of Mr. Slugg were:*

> *Question: Mr. Slugg, the SEC did initiate an action, didn't they?*
>
> *Answer: Yes, they did.*
>
> *Question: All right. Ultimately. Maybe not as soon as they ought to but they did, didn't they?*
>
> *Answer: Against Tekna and the individuals but not under the injunction, I don't believe.*
>
> *Question: Well, they did initiate an action and took evidence and proceeded?*
>
> *Answer: Correct. They did.*

*(Vol. VII-64)*

24

*Their mistake was not in that judgment. It was rather their erroneous view of what had in fact occurred fifteen years before in that same federal court.*

*There are few perfect trials, and in the heat of trial honest mistakes will occur, mistakes that after the fact are difficult to fathom, even those as here. But good faith cannot answer our question. In blunt terms, an apology framed for hanging on a cell door is no substitute for fundamental fairness. Certainly the doctrine of plain error is no hand maiden for such an outcome – at least it should not be. And I see little point in leaving the cleanup for the federal habeas claim of ineffective assistance of counsel that will follow. I do not suggest that my colleagues disagree with this in principle, that they are more tolerant of unfairness, or lack concern over this error. To the contrary, the majority opinion fairly sets out the facts. It is that we part company in our judgments about the effect of the error upon the trial. In making a judgment about the likelihood of a different outcome absent the error, there will be honest differences of opinions, as here. I am persuaded that Bremers has met his burden of showing that a substantial right has been compromised[4] and*

---

[4] *See United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc), abrogated in part by *Johnson v. United States*, 520 U.S. 461 (1997).

25

*severely affected the fairness and integrity of the proceedings.*[5]

*I would reverse and remand for a new trial.*

---

[5] *United States v. Olano*, 507 U.S. 725, 732, 736–37 (1993).