**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**September 10, 2003**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-40978

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN ARTURO MENDOZA-MEDINA,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

Before KING, Chief Judge, and HIGGINBOTHAM and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Juan Arturo Mendoza-Medina appeals his convictions for conspiracy to possess and possession with intent to distribute more than fifty kilograms of marijuana.[1] We affirm the judgment of conviction, finding that any error in the district court's charge to the jury on deliberate indifference was harmless and that the court's admission of hearsay evidence was not plain error. We also conclude that although the trial court erred in admitting the opinion testimony of a government agent, on the facts of this case

---

[1] *See* 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1).

this abuse of the use of a "background" witness was not reversible error. We pause to caution that it is time for our able trial judges to rein in this practice. The offering of this "expert" was not background for the jury – a jury is ordinarily blessed with a common sense well tuned by life in this age. Rather, excessive use of this "expert" testimony comes unacceptably close to the use of evidentiary profiles.

I

A grand jury indicted Mendoza-Medina on January 8, 2002, on two counts: conspiracy to possess with intent to distribute more than fifty kilograms of marijuana, a violation of 21 U.S.C. § 846; and possession with intent to distribute more than fifty kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). Mendoza-Medina's first trial ended in a mistrial – eleven jurors finding him guilty, one juror when polled answered "not sure." The case was retried.

At the second trial, Senior Border Patrol Agent Mario Rebolledo testified that he and his drug detecting dog, "Rudy," were working in the Laredo Border Patrol checkpoint on December 21, 2001, when Rudy alerted to a tractor-trailer driven by Mendoza-Medina. Agents directed the truck to a secondary inspection point. After obtaining the keys from Mendoza-Medina, agents placed Rudy in the trailer, where he alerted to a group of boxes. Agents found marijuana in the boxes. They arrested Mendoza-Medina and escorted

him to the checkpoint trailer. Mendoza-Medina's wife and children remained in the cab.

Agents advised Mendoza-Medina of his rights and placed him in a holding cell in the trailer. He waived his right to remain silent and agreed to an interview. He told Rebolledo that neither he nor his wife had anything to do with the substance found in the boxes. He also declared he was willing to talk about the people who hired him.

Two agents with the DEA task force were called, and arrived at the Laredo North Station, which is roughly twenty minutes from the checkpoint, between 1:30 and 2:00 a.m. the next day. Mendoza-Medina, his wife, and his two children were in the processing room. Initially, the agents planned to interview Mendoza-Medina with his wife and children in the room, but the children interrupted the interview. The agents conducted the interview in a separate room with the door open. The children still had access to Mendoza-Medina, and were in and out of the room several times during the interview.

Mendoza-Medina told the agents that he knew nothing about the contraband. He asked the agents what was going to happen, and they responded that he and his wife would be detained and taken before a magistrate judge. He then asked what would happen to his children, and the agents said they would be taken care of by Child Protective Services. Mendoza-Medina reacted to this disclosure by stating to the agents that he would tell them "anything [they]

3

wanted to hear and he would take the blame." The agents said they wanted him to tell the truth. Mendoza-Medina told them that is what he would do.

Mendoza-Medina told the agents that his employer, Julian Ramirez, asked him to haul marijuana with his legitimate load. The legitimate load was en route to New York, while the marijuana was to be dropped off in Dallas. Ramirez had instructed Mendoza-Medina to pick up the trailer at a gas station in Laredo. They planned to rendevous at the Pilot Station Truck Stop in Dallas where the drugs would be unloaded. Ramirez was to pay Mendoza-Medina $3000. Mendoza-Medina stated that this was his first time smuggling drugs. He told agents that his wife did not know anything about the drugs, which the agents confirmed. After a short interview, Mendoza-Medina's wife left with the children, and Mendoza-Medina was processed.

The agents checked Mendoza-Medina's story. They found phone calls to and from Ramirez on Mendoza-Medina's cell phone. A bill of lading found in Mendoza-Medina's truck reflected that Ramirez had picked up the trailer on December 20. Agents learned that Mendoza-Medina had begun working for Ramirez only two months earlier, and that Ramirez had a drug trafficking conviction.

The shipping company had loaded the truck with women's jeans at a warehouse in Laredo on December 20. Ramirez had brought the trailer to the warehouse, and left with it some time between 7:30 and 8:00 p.m. The trailer was locked and sealed. An employee of

4

the shipping company testified that he inspected the trailer after it was seized by the Border Patrol, and he believed someone tampered with the lock and opened the doors without breaking the seal.

At trial, the Government had DEA Special Agent Keith Warzecha qualified as an expert. He testified that the marijuana seized was worth $77,600 in Laredo, and about $135,000 in Dallas. He described the cultivation, wrapping, and packaging of the drugs. He also described how traffickers usually recruited people who needed the money to transport the drugs, and enticed them with a quick pay day. He testified that many truck drivers passed through Laredo, and some were susceptible to the lure of drug trafficking. In the usual case, contraband owners limited inexperienced drivers to smaller loads. After successfully moving two or three small loads and proving he could be trusted, a driver would be given bigger loads. When the prosecutor asked if traffickers concealed contraband in a truck without telling the driver it was there, the district court answered Mendoza-Medina's objection with the observation that some times they do, and some times they don't. After persisting in the objection, the district court had the prosecutor move on. The agent then testified that it was possible to put the drugs in the trailer without disturbing the seal. He also recalled that he had investigated cases in which children were involved in smuggling, and suggested smugglers were under the

impression that law enforcement personnel were not inclined to suspect individuals with children of smuggling drugs.

Warzecha then testified that Ramirez had a history of narcotics trafficking, including a 1993 conviction involving over 1000 pounds of marijuana. Warzecha also explained that agents had seized $368,000 in cash from Ramirez in October 2001, and opined that the money was drug related. At the time of that seizure, Ramirez told agents that he was returning from a three-day trip hauling goods to and from Ohio with Mendoza-Medina. Hotel records showed that Ramirez had stopped in Dallas during the time he said he was on the trip. However, this trip was missing from both Mendoza-Medina's and Ramirez's logbooks, although the logbooks showed that Mendoza-Medina had been driving with Ramirez since early October. On cross-examination, Warzecha admitted that Ramirez had told agents that he had found the money outside the gate of a forwarding company while Mendoza-Medina was driving the truck through the gate and that Mendoza-Medina did not know about the money. Warzecha admitted that nothing tied the money to Mendoza-Medina. He also opined that Ramirez was lying.

Mendoza-Medina's wife testified that late in the evening on December 20 she learned that Mendoza-Medina was going to transport a load of goods. Because of the late hour, she suggested she take their two four-year-olds with them, and leave their other children with her sister. They picked up the tractor-trailer at a gas station, and Ramirez took their van.

She explained that at the Laredo North Station, agents separated her and the children from Mendoza-Medina. She heard agents yelling at her husband, and it caused the girls to call out for their father. An agent told her he did not believe what her husband was telling them, emphasizing his point by striking the wall with heavy blows. He reportedly told her that if neither she nor her husband took responsibility for what was going on, they would lose their daughters to the state. At the end of his interrogation, Mendoza-Medina told her that he would have to take responsibility for the drugs in the trailer so that the agents would not take the children from her. According to Mendoza-Medina's wife, neither agent told her about Child Protective Services; instead they told her the children would be taken away.

During cross-examination, she admitted that in an earlier hearing she did not say that the agent threatened to take her children away. She conceded that she could see everything that went on in the interrogation room, and that she did not hear her husband tell agents how he agreed to haul the drugs.

The jury found Mendoza-Medina guilty on both counts. The district court sentenced him to concurrent fifty-one month prison terms followed by concurrent three-year terms of supervised release. Mendoza-Medina timely appealed.

II

A

We turn first to Mendoza-Medina's objection to the admission of the expert testimony of Special Agent Warzecha. "We review a district court's decision to admit or exclude evidence for abuse of discretion. Review of evidentiary rulings is heightened in a criminal case."[2] Any error in admitting the evidence is subject to harmless error review.[3] "[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required."[4]

Mendoza-Medina argues that Warzecha's testimony crossed the line from permissible expert testimony to impermissible opinion testimony regarding whether Mendoza-Medina was aware that the drugs were in the truck. Mendoza-Medina points to the following testimony to support his claim: (1) managers in charge of transportation recruit people to transport drugs; (2) the amount of drugs in a load depends on the person's narcotics transporting experience, for example, new recruits carry 200 to 300 pounds of marijuana;[5] (3) trust between the distributor and driver is an essential component; and (4) narcotics traffickers bring their wives and children along to mask the drug trafficking offense.

---

[2] *United States v. Gutierrez-Farias*, 294 F.3d 657, 662 (5th Cir. 2002) (citation omitted).

[3] *United States v. Williams*, 957 F.2d 1238, 1242 (5th Cir. 1992).

[4] *Id.* (internal quotation marks omitted).

[5] 203.5 pounds of marijuana were found in Mendoza-Medina's trailer.

8

Mendoza-Medina also argues that the Government impermissibly used this testimony as substantive evidence in its opening and closing arguments. For example, the prosecution stated, "Special Agent Keith Warzecha's experience of five years and hundreds of cases here in Laredo, Texas tells us the defendant knew ...," and "we also know that it's true, based on DEA intelligence, that narcotics trafficking organizations don't just stick marijuana on tractors of drivers that don't know where it's going."

The Government argues that Warzecha's testimony was permissible expert background testimony which never specifically identified Mendoza-Medina's conduct as consistent with a drug courier profile or broached the issue of Mendoza-Medina's knowledge of the drugs in the trailer. It also contends that the court's instruction that the expert's opinions could be accepted or rejected by the jury was sufficient, and that any abuse of discretion was harmless because of the other evidence of Mendoza-Medina's guilt.

In *United States v. Williams*, we noted that drug courier profiles "have long been recognized as inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers," and therefore are not admissible as substantive evidence of the defendant's guilt.[6] In addition, drug

---

[6] *Id.* at 1241-42 (internal quotation marks omitted).

9

courier profiles can violate Federal Rule of Evidence 704(b)[7] when they are used to prove that the defendant was a courier and therefore knew that he was transporting drugs.[8]

In *United States v. Gutierrez-Farias*[9] and *United States v. Ramirez-Velasquez*,[10] we held that admission of similar expert testimony was an abuse of discretion. In *Gutierrez-Farias*, a DEA agent testified as an expert on the business of transporting illegal narcotics through South Texas.[11] He explained:

> The way it usually works in that respect is that I don't think they would target somebody just off the street that, you know, has no knowledge. Usually, it's somebody that is a friend of a friend. It could start that way. Usually they want to use people that ... have a certain amount of trust and responsibility because you have to realize as we showed before here, the amount of money that the narcotics communicates too. It's a lot of money and ... this is ... a business.... [J]ust as in any other business, the people need a certain amount of

---

[7] Federal Rule of Evidence 704(b) reads:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

[8] *See United States v. Ramirez-Velasquez*, 322 F.3d 868, 879 (5th Cir. 2003); *United States v. Gutierrez-Farias*, 294 F.3d 657, 661-63 (5th Cir. 2002).

[9] *Gutierrez-Farias*, 294 F.3d at 661-63.

[10] *Ramirez-Velasquez*, 322 F.3d at 879.

[11] *Gutierrez-Farias*, 294 F.3d at 661-62.

10

credentials, if you will, to be employed or to be sought out by a narcotics trafficking organization.[12]

We expressed doubts as to whether the agent's testimony about what a drug courier would have known could be characterized as "expert."[13]  We then concluded:

> Agent Afanasewicz's testimony crosses the borderline long recognized by this court between a mere explanation of the expert's analysis of the facts and a forbidden opinion on the ultimate legal issue in the case.  The clear suggestion of Agent Afanasewicz's testimony is that, because most drivers know there are drugs in their vehicles, Gutierrez must have known too.  Although admittedly Agent Afanasewicz did not say the magic words – "In my expert opinion, Gutierrez knew the marijuana was in the tires." – we believe his testimony amounted to the functional equivalent of such a statement.[14]

In *Ramirez-Velasquez* we reached the same conclusion.[15]  The prosecutor at first sought an explicit opinion from the agent, asking, "And based on your experience, do those drivers know what they are carrying?"[16]  On defense counsel's objection, the prosecutor rephrased her question to ask how drug conspiracy organizations choose their drivers.[17]  The agent then testified, with no objection from defense counsel, that "drivers are paid

---

[12] *Id.* at 662.

[13] *Id.* at 663.

[14] *Id.* at 663 (internal quotation marks and citations omitted).

[15] *Ramirez-Velasquez*, 322 F.3d at 879.

[16] *Id.* at 878.

[17] *Id.*

11

based on past performance, and that organizations tend to seek trustworthy drivers because their cargo is valuable and uninsurable."[18]  The agent stated:

> With a legitimate product you have – you don't have to conceal it.  And you have insurance in case the product is lost or damaged.  In the case of an illegal product, of course you have to conceal it and try to get it where it's going without being detected.  There is no insurance if it's lost or stolen.  The only real assurance you have is the trust you have in the people that are working for you.[19]

Relying on *Gutierrez-Farias*, we concluded that admission of this testimony was plain error because, "[a]s did the agent in *Gutierrez-Farias*, Agent Hacking made the generalization, albeit not quite directly, that drivers know they are carrying drugs."[20]

In the same vein we find that the district court abused its discretion in admitting Agent Warzecha's testimony.  Warzecha made the same generalized statements regarding distributors having to trust their couriers and included the profile that couriers often bring their wives and children along.  In addition, the prosecutor argued that this testimony proved that Mendoza-Medina knew the drugs were present, using the testimony as substantive evidence.

We must next decide whether the error was harmless.  The evidence against Mendoza-Medina is substantial.  Mendoza-Medina

---

[18] *Id.*

[19] *Id.* at 878 n.12.

[20] *Id.* at 879.

confessed, although he challenges that confession as coerced. His confession is supported by the evidence that Ramirez was a convicted drug trafficker and was found with $368,000 in cash following a trip with Mendoza-Medina that involved a stop in Dallas. Given the strength of this evidence we conclude that admission of this testimony, although error, was harmless.

B

Mendoza-Medina also argues that the district court abused its discretion in admitting Warzecha's testimony regarding Ramirez's statements to other officers at the time of Ramirez's arrest in October 2001. Mendoza-Medina objected in a pretrial motion and renewed that objection at the start of Warzecha's testimony at trial, arguing that the testimony was hearsay or prior bad acts that did not qualify for admission under Rule 801(d)(2)(E)[21] or Rule 404(b).[22]

The prosecutor asked Agent Warzecha if he had any information with regard to Ramirez being involved in narcotics trafficking. Warzecha testified that Ramirez had a 1993 conviction for

---

[21] Under this rule statements offered against a party that were made by a coconspirator of the party during the course and in furtherance of the conspiracy are not hearsay. Fed. R. Evid. 801(d)(2)(E).

[22] Rule 404(b) provides that evidence of other crimes, wrongs, or acts is admissible for purposes other than to "prove the character of a person in order to show action in conformity therewith," such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

13

transporting 1100 pounds of marijuana. The prosecutor then asked if Warzecha was aware of any other arrest or detention that "associate[s] him, in your opinion, with narcotic trafficking." Warzecha stated that agents seized $368,000 in cash from Ramirez in Laredo in late October, 2001. The prosecutor then asked if that seizure, which Warzecha viewed as drug related, was "in any way associated with the defendant." Over Mendoza-Medina's renewed objection, Warzecha testified as to what Ramirez told other officers in his post-arrest statement after the cash seizure.

Warzecha stated that Ramirez told officers that Mendoza-Medina accompanied him on a trip hauling freight to and from Ohio from October 23 through October 26, 2001. Ramirez claimed that when they arrived at the freight forwarding company on the return trip, he got out of the cab to open the gate while Mendoza-Medina drove the truck in and unhitched the trailer. After Mendoza-Medina left in the truck, Ramirez went to close the gate and found $368,000 cash in boxes by the road. Ramirez stated that he took the boxes and left in his car, and that Mendoza-Medina was not aware that he found the cash. Warzecha testified that the trip was not in either Mendoza-Medina's or Ramirez's logbooks, but the logbooks showed that the two had been driving together since early October. Warzecha further explained that agents released Ramirez after the seizure, and that Ramirez was challenging the forfeiture of the cash. He also stated that in his opinion, the money was drug related, and that Ramirez was lying about finding the cash.

14

Mendoza-Medina argues that the Government did not prove by a preponderance of the evidence that a conspiracy existed and that Ramirez's statement was made in furtherance of the conspiracy. "The proponent of admittance under Rule 801(d)(2)(E) must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy."[23] As the Government notes, the court may admit the evidence subject to the prosecution's subsequent establishment of an adequate foundation.[24]

Although we consider the contents of the statement, they alone are insufficient "to establish the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered."[25] Aside from the challenged statement, other evidence of a conspiracy included Ramirez's 1993 conviction for transporting marijuana; the seizure of $368,000 in cash from Ramirez; the testimony that the logbooks showed Mendoza-Medina had been driving with Ramirez since early October; Mendoza-Medina's confession that Ramirez asked him to transport the drugs

---

[23] *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999).

[24] *United States v. Kimble*, 719 F.2d 1253, 1257 (5th Cir. 1983); *Bourjaily v. United States*, 483 U.S. 171 (1987). These "subject to" admissions have been constrained by insisting upon a preliminary (pretrial) showing by the government of its proof of a conspiracy independent of the proffered statement.

[25] Fed. R. Evid. 801(d)(2).

seized on December 21; and the evidence concerning Ramirez's involvement in the loading of the freight on December 20.

This evidence, when combined with the proffered statement that Mendoza-Medina was along on the October trip when the money was "found," is sufficient to conclude by a preponderance of the evidence that a conspiracy existed between Mendoza-Medina and Ramirez in October when Ramirez made the challenged statements. A preponderance of the evidence also supports that Ramirez made the statements during and in furtherance of the conspiracy, as he likely made them to conceal the source of the $368,000 and assure that the conspiracy could continue.[26]  Given this evidence, we cannot conclude that the district court's admission of the statements under Rule 801(d)(2)(E) was an abuse of discretion.

Neither was it an abuse of discretion to admit the evidence under Rule 404(b).[27]  The key issue in Mendoza-Medina's trial was his knowledge of the drugs seized from the truck he was driving. At the time of the seizure, Mendoza-Medina testified that Ramirez asked him to transport the drugs to Dallas in exchange for $3000. That Ramirez had been found with $368,000 in cash immediately

---

[26] *See United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000) ("Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.").

[27] *See United States v. Hernandez-Guevara*, 162 F.3d 863, 870 (5th Cir. 1998) (stating that evidence is admissible under Rule 404(b) if it is "relevant to an issue other than the defendant's character .... [and] possess[es] probative value that is not substantially outweighed by its undue prejudice").

following a trip with Mendoza-Medina that involved a stop in Dallas suggests that Mendoza-Medina had been involved in drug trafficking before, and therefore probably knew of the drugs on December 21. Because this evidence went towards his knowledge of the drugs, it was admissible under Rule 404(b).

On appeal, Mendoza-Medina raises a further objection to Warzecha's testimony regarding Ramirez's statement to agents at the time of the cash seizure. Mendoza-Medina argues that even if Ramirez's statements are admissible under Rule 801(d)(2)(E), they are still inadmissible hearsay because Ramirez did not make the statements to Warzecha, but rather to other officers. Because Mendoza-Medina did not raise this objection at trial, we review the admission of the evidence for plain error.[28]

Warzecha's testimony regarding statements Ramirez made to other officers does appear to be double hearsay even if the statements themselves are admissible as those of a coconspirator under Rule 801(d)(2)(E). That Warzecha was presented as an expert did not automatically permit him to testify about Ramirez's statements to other officers and avoid the hearsay rule.[29] However, in reviewing admission of this evidence only for plain error, it is

---

[28] *See United States v. Greenwood*, 974 F.2d 1449, 1463 (5th Cir. 1992).

[29] *See United States v. Cantu*, 167 F.3d 198, 205-06 (5th Cir. 1999) (discussing how allowing law enforcement officers to testify as experts because of their involvement in an investigation would circumvent the hearsay rule and raise serious concerns).

17

within our discretion to correct an error if we conclude that, "when examined in the context of the entire case, it is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings."[30] Because the Government could have elicited the same testimony from the interviewing agent, and defense counsel likely preferred Agent Warzecha instead, the admission of Warzecha's testimony recounting Ramirez's statements did not affect the fairness, integrity, or public reputation of this proceeding and we decline to find plain error.

C

We turn next to Mendoza-Medina's challenge to the district court's deliberate ignorance instruction. Mendoza-Medina objected to the instruction at trial and argues that it was reversible error because the evidence did not raise the issue of deliberate ignorance. "The standard of review of a defendant's claim that a jury instruction was inappropriate is whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them."[31] The trial court's charge must not only be "legally accurate, but also factually

---

[30] *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 275 (5th Cir. 1998) (internal quotation marks and brackets omitted).

[31] *United States v. Lara-Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990) (italics and internal quotation marks omitted).

18

supportable"; "the court may not instruct the jury on a charge that is not supported by evidence."[32] In assessing whether the evidence sufficiently supports the district court's charge, we "view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government."[33] Any error is subject to harmless error review.[34]

We have often cautioned against the use of the deliberate ignorance instruction.[35] "Because the instruction permits a jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct, the deliberate ignorance instruction poses the risk that a jury might convict the defendant on a lesser negligence standard – the defendant *should* have been aware of the illegal conduct."[36] We have established a two-pronged test for determining when the evidence supports a deliberate ignorance instruction:

> The circumstances which will support the deliberate ignorance instruction are rare. The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence

---

[32] *Id.* (internal quotation marks omitted).

[33] *Id.*

[34] *See United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993).

[35] *See, e.g.*, *United States v. Bieganowski*, 313 F.3d 264, 289 (5th Cir. 2002); *United States v. Peterson*, 244 F.3d 385, 395 (5th Cir. 2001).

[36] *Lara-Velasquez*, 919 F.2d at 951.

19

of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct.[37]

The *sine qua non* of deliberate ignorance "is the *conscious* action of the defendant – the defendant *consciously* attempted to escape confirmation of conditions or events he strongly suspected to exist."[38]  Where "the choice is simply between a version of the facts in which the defendant had actual knowledge, and one in which he was no more than negligent or stupid, the deliberate ignorance instruction is inappropriate."[39]

Neither the Government nor the defense requested a deliberate ignorance instruction, but the district court *sua sponte* gave one over the objection of Mendoza-Medina.  The trial court overruled the objection, concluding that the evidence supported the charge. It explained that according to its reading of *United States v. Wells* the instruction is appropriate whenever the evidence shows both "a subjective awareness of a high probability of the existence of illegal conduct" and "some attempt by the defendant, whether it is direct or indirect, to deny the knowledge of the illegal activity or conduct."[40]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] The district court cited *United States v. Wells*, 262 F.3d 455, 465-66 (5th Cir. 2001), although it incorrectly referred to the case as *United States v. Scott*.

The district court misstated the test; the second prong is not that the defendant denied knowledge of the illegal activity, but rather "purposeful contrivance to avoid learning of the illegal conduct."[41]

The Government argues that there was evidence of actual knowledge, specifically Mendoza-Medina's admission that Ramirez offered him an opportunity to transport contraband with a legitimate load. The Government also asserts that the circumstances surrounding the seizure raised an inference that Mendoza-Medina had a subjective awareness of a high probability of the existence of illegal conduct. It notes that Mendoza-Medina was on the Ohio trip during which Ramirez "found" the large stash of cash outside a freight forwarding company, and points to the fact that Mendoza-Medina picked up his load at a gas station well away from the freight forwarding warehouse, more than two hours after it was loaded.

As for the second element, that the defendant purposely contrived to avoid learning of the illegal conduct, the Government cites Mendoza-Medina's testimony that it was not unusual for a driver to pick up a load at a location away from the loading dock some hours later and that it was not unusual for drivers to neglect to fill out their logbooks. The Government further points to the testimony of Mendoza-Medina's wife, who testified that Mendoza-

---

[41] *Id.* at 465 (internal quotation marks omitted).

Medina told her he was surprised to be arrested at the checkpoint and that he was unaware of why he was being held. The Government suggests this was a "purposeful contrivance to avoid learning of the illegal conduct," or, at a minimum, "an attempt to create a charade of innocence."

We conclude that the district court erred in giving the deliberate ignorance instruction. Mendoza-Medina correctly argues that the evidence either indicates that he knew about the drugs or that he did not, and does not suggest that he was deliberately ignorant to the scheme. We have explained that "the district court should not instruct the jury on deliberate ignorance when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question."[42] Although in some cases evidence of actual knowledge can be interpreted as evidence of a subjective awareness of a high probability of the existence of illegal conduct,[43] in this case, that does not hold true. Here, the evidence of actual knowledge was Mendoza-Medina's admission that he knew he was carrying drugs and the inference that he had done it before on the trip to Ohio with Ramirez. Unlike the case where the evidence supports an inference of either actual knowledge or a subjective awareness,

---

[42] *Lara-Velasquez*, 919 F.2d at 951.

[43] *Id.* at 952.

such as nervousness upon being stopped by authorities,[44] an admission indicates either that Mendoza-Medina had actual knowledge or no knowledge at all, if the statement was coerced. The other evidence cited by the Government, such as the fact that the truck was not picked up at the loading dock, is not sufficient to give rise to an inference that the defendant was subjectively aware of a high probability of the existence of the illegal conduct.

Neither does the evidence support an inference that Mendoza-Medina purposely contrived to avoid learning of the illegal conduct. The only evidence supporting that inference is that Mendoza-Medina picked up the truck away from the loading dock a couple of hours after it was loaded. As there are numerous innocent explanations for this, it can hardly support an inference that he "purposely contrived to avoid learning" of the drugs. As for his claims to his wife that he was surprised to be arrested and did not know what was going on, that also does not support such an inference. It merely indicates that he was either truly unaware of the drugs or was pretending that he was innocent.

Relying on *United States v. Boutte*,[45] the Government argues that even if we conclude no evidence supported the instruction, it was harmless error. In *Boutte* we reasoned that "where there is no evidence of conscious ignorance, a deliberate ignorance instruction

----

[44] *See id.* at 952–53.

[45] 13 F.3d 855 (5th Cir. 1994).

23

is surplusage and thus does not create the risk of prejudice."[46] We decline to adopt the Government's reading of *Boutte* to establish a bright-line rule that whenever the evidence does not support the deliberate ignorance instruction there can be no harm. If the only time it is error to give the instruction is when the evidence does not support it, but when there is no evidence to support giving the instruction it is always harmless to do so, then giving the instruction can never be reversible error. We cannot assume that in every instance in which the evidence does not support the deliberate ignorance instruction the jury will disregard it. We have repeatedly stated that the instruction should rarely be given because it possesses a danger of confusing the jury.[47]

However, we have also stated that "an error in giving the deliberate ignorance instruction is 'harmless where there is substantial evidence of actual knowledge.'"[48] Mendoza-Medina confessed and his confession is corroborated by the evidence surrounding the Ohio trip. The record contains substantial evidence of Mendoza-Medina's actual knowledge, rendering the deliberate ignorance instruction harmless error.

---

[46] *Id*. at 859 (internal quotation marks omitted).

[47] *See United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993).

[48] *United States v. Saucedo-Munoz*, 307 F.3d 344, 349 n.5 (5th Cir. 2002) (quoting *United States v. Wells*, 262 F.3d 455, 466 (5th Cir. 2001)).

III

The district court erred in admitting Agent Warzecha's testimony and in giving a deliberate ignorance instruction where it was not supported by the evidence. However, given the substantial evidence of Mendoza-Medina's guilt, we conclude that these errors were harmless, and AFFIRM the judgment of conviction.