United States Court of Appeals
Fifth Circuit

**F I L E D**

May 27, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-41142

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAIME GARCIA-GIL,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
(03-CR-652)

_____

Before REAVLEY, DeMOSS and PRADO, Circuit Judges.

PER CURIAM:[*]

Appellant Jaime Garcia-Gil challenges both his conviction for drug possession and his sentence. For the reasons that follow, we reject his arguments and affirm the district court's judgment.

On April 23, 2003, Garcia-Gil pulled the pickup truck he was driving into the Freer, Texas, Border Patrol checkpoint. When Garcia-Gil stopped at the checkpoint, an agent's dog alerted to the driver's-side door. The agent, Albert Martinez, took Garcia-

---

[*]Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

1

Gil's border-crossing card[1] and asked him some questions. In response, Garcia-Gil indicated that he was driving to Houston to pick up some satellite-television dishes along with some appliances, specifically a washing machine and a dryer. He also presented a bill of sale for the pickup and claimed he owned the truck. During the questioning, Agent Martinez noticed that Garcia-Gil seemed to be riding unusually high in his pickup, so high that the steering wheel was at his thighs.

Martinez sent Garcia-Gil to the secondary inspection area. Once there, Garcia-Gil exited his truck. Agent Martinez inspected the driver's seat area, confirming that the seat was placed extremely high——perhaps eight to ten inches higher than normal——and noticed that the seat was very hard, as if it had little cushioning. He also observed that the bolts holding the seat to the frame came off without any pressure and appeared to have been pried off before. Another agent drilled into the area underneath the seat, where he found some white powder that turned out to be cocaine. Ultimately, the agent found twenty bundles of cocaine with a total weight of around twenty kilograms. The cocaine's estimated value was over one million dollars.

The agents arrested Garcia-Gil. Once told that he was under arrest, Garcia-Gil turned around and simply placed his hands behind his back. He said nothing at that point. The agents

---

[1]Garcia-Gil is a Mexican citizen.

handcuffed Garcia-Gil and read him his *Miranda* rights.  One of the agents, Agent Loa, later testified that after being warned, Garcia-Gil repeatedly asked himself what he had done and told the agents that he had children.  According to Agent Martinez, Garcia-Gil also said that he intended to drive back from Houston in a different truck.

The agents then searched Garcia-Gil and his truck.  They found that Garcia-Gil was carrying a cell phone, along with $800 and some receipts.  Inside the pickup, the agents found a gym bag containing new clothes.  Agent Martinez later testified that Garcia-Gil told him that a friend had given him $500 and the cell phone.  Garcia-Gil also said that this same friend told him to drive the truck to Houston.

Eventually, a DEA agent, Agent Nivar, arrived on the scene. According to Agent Nivar, Garcia-Gil told him that a friend named Buey had loaned him the truck in Monterrey to pick up appliances in Houston, that Garcia-Gil had purchased insurance in Mexico, and that the money was from his savings.  Garcia-Gil made additional statements (about where he had stopped, for example) that were supported by the receipts in the pickup.

Garcia-Gil was later indicted on one count each of conspiracy and possession with the intent to distribute more than five kilograms of cocaine.  Garcia-Gil pleaded not guilty to both counts, and the case against him proceeded to trial.

At the beginning of trial, Garcia-Gil filed a motion in limine, asking the court to exclude expert evidence about drug-smuggling organizations, particularly "expert testimony that an accused acted in a manner consistent with possession with intent to distribute a controlled substance or any such statement whose direct implication is that the accused had the requisite mental state." The Government responded that it had no intention of offering that kind of testimony. Given this response, the district court did not rule on Garcia-Gil's motion, and Garcia-Gil did not press for a ruling.

During trial, the Government introduced evidence about the stop and the search. As part of that evidence, Agent Martinez, when asked about the position of the driver's seat, responded, "We usually look for that, you know, they'll modify seats and stuff like that." The Government later referred to this testimony during its closing arguments.

Garcia-Gil's brother and wife testified on his behalf. His brother, Roberto Perales-Gil, testified that Garcia-Gil helped him in his business, which involved buying electronic equipment, such as satellite dishes, and then selling that equipment in Mexico. Perales-Gil testified that Garcia-Gil would help him by making trips to flea markets in Houston. Perales-Gil also told the jury that on one of the Houston trips, Garcia-Gil arranged to buy a washer and dryer but had to save some money before he could purchase the appliances.

4

Garcia-Gil's wife, Natalia, testified that on April 2, 2003, she received a 7 a.m. phone call from someone informing her that he had a pickup ready to be loaned to her husband. At the time, Garcia-Gil was out working his regular job delivering tostadas; he did not return until the next day. On the day he was arrested, according to his wife, Garcia-Gil left the house around 8 a.m. and called her from Laredo at 1 p.m. Natalia also testified that they were poor and that Garcia-Gil was a good father, a peaceful person, and someone who respected the law.

The jury convicted Garcia-Gil on both counts. The district court, however, dismissed the conspiracy charge for insufficient evidence. After the conviction, but before sentencing, Garcia-Gil spoke with Agent Nivar and gave him information about the person who provided the pickup. Throughout this time, Garcia-Gil continued to maintain his innocence. Over Garcia-Gil's objections based on the safety valve provision of the Sentencing Guidelines and his minor role in the drug operation, the court sentenced him to 151 months in prison with five years of supervised release and imposed a $100 special assessment. This appeal followed.

**Drug Courier Profile Testimony**

Garcia-Gil first argues that the Government improperly introduced drug-courier-profile testimony at trial. Specifically, he complains about Agent Martinez's testimony

concerning the elevated seats: "We usually look for that, you know, they'll modify seats and stuff like that."[2]  According to Garcia-Gil, the Government compounded the problem by referring to this testimony during closing argument.  Garcia-Gil also raises vague *Daubert* challenges under Federal Rule of Evidence 702.

Garcia-Gil failed to obtain a ruling on his limine motion and failed to object to the testimony at trial.[3]  Thus, the admission of this testimony is reviewed for plain error.  *See* FED. R. EVID. 103; *United States v. Graves*, 5 F.3d 1546, 1551—52 (5th Cir. 1993).  Under this standard, we first ask whether there is an error that "is plain and affects substantial rights." *United States v. Rhodes*, 253 F.3d 800, 804 (5th Cir. 2001).  Yet we do not correct such an error unless we conclude "that the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id*. (quoting *United States v. Thames*, 214 F.3d 608, 612 (5th Cir. 2000)).

In general, "drug courier profiles 'have long been recognized as inherently prejudicial because of the potential

---

[2]Agent Martinez's full testimony about seat placement was

> We usually look for that, you know, they'll modify the seats and stuff like thatAnd we found people before hiding under the seats and stuff like that.  So we always take notice of, you know, how they're in the vehicle and stuff.

[3]Garcia-Gil also never filed a motion under Federal Rule of Evidence 702.

they have for including innocent citizens as profiled drug couriers,' and therefore are not admissible as substantive evidence of the defendant's guilt." *United States v. Mendoza-Medina*, 346 F.3d 121, 128 (5th Cir. 2003) (quoting *United States v. Williams*, 957 F.2d 1238, 1241—42 (5th Cir. 1992)). Garcia-Gil contends that this kind of improper evidence was admitted in his case.

Yet the testimony that Garcia-Gil challenges is of a different nature than the testimony in other cases involving drug courier profiles. In those cases, the testimony has often directly addressed the defendant's knowledge that he was transporting drugs.[4] For example, in *United States v. Gutierrez-Farias,* 294 F.3d 657, 662–63 (5th Cir. 2002), the court held that the district court abused its discretion when it admitted a DEA agent's testimony about drug organizations' hiring processes. Specifically, the agent testified that when looking for someone to transport drugs, the organizations look for people with "knowledge[] that they're involved in this kind of business." *Id.* at 662.

In *Mendoza-Medina*, the testimony was similar. The agent in that case testified that drug dealers have to trust their

---

[4]Thus, the testimony in these cases also raises the problem of expert testimony about a defendant's mental state. *See* FED. R. EVID. 704(b); *Mendoza-Medina*, 346 F.3d at 128. Garcia-Gil does not contend that this issue is implicated here.

couriers, and that couriers sometimes bring their wives and children along to hide their drug activities. *Mendoza-Medina*, 346 F.3d at 127. (The defendant's wife and children had been with him when he was arrested. *Id*. at 125.) The prosecutor summed up in closing, "we also know that it's true, based on DEA intelligence, that narcotics trafficking organizations don't just stick marijuana on tractors of drivers that don't know where it's going." *Id*. at 128. Based on these statements and the conclusion the Government wanted the jury to draw from them, the *Mendoza-Medina* court determined that the district court had abused its discretion in admitting the agent's testimony. *Id*. at 129.

What Garcia-Gil complains about is not classic drug-courier-profile testimony. Compared with the testimony in *Gutierrez-Farias* and *Mendoza-Medina*, Agent Martinez's testimony, explaining why Garcia-Gil was sent to the secondary inspection area, is of an entirely different nature. In addition, Garcia-Gil's argument that this was drug-courier-profile testimony ignores what Martinez said immediately after "they'll modify the seats and stuff like that." Martinez's continued testimony sounds like elevated seats were signs of smuggling people, not drugs: "And we found people before hiding under the seats and stuff like that. So we always take notice of, you know, how they're in the vehicle and stuff." It is therefore not clear that this testimony was,

in fact, about drug couriers at all.

Moreover, the Government's use of the testimony in its closing argument solely focused on the irregular placement of the seat: "[Agent Martinez] noticed something unusual.  And it was that the seat in that truck was lifted.  Not the truck, itself.  But the seat in the truck was lifted."  This statement does not refer to any of the types of improper expert testimony that Garcia-Gil complains about.[5]  After all, Garcia-Gil's motion in limine addressed "expert testimony concerning the operations of drug smuggling organizations."  But in closing, the Government referred to the testimony in the context of Garcia-Gil's truck containing something obviously out of the ordinary, not in the context of how drug smuggling organizations generally operate.  This testimony was not expert testimony about drug operations, and so Garcia-Gil's limine motion was not implicated.  Garcia-Gil has not shown error in admitting Agent Martinez's testimony or in referring to this testimony in closing argument.

**Pre-*Miranda* Silence**

Garcia-Gil next argues that the Government violated his Fifth Amendment rights by using his postarrest, pre-*Miranda*-warning silence as evidence of his guilt.  Garcia-Gil admits that he failed to object at trial to this testimony and concedes that

---

[5]Garcia-Gil does not challenge Martinez's knowledge of the normal seat height for a pickup truck.

9

review is for plain error.

Garcia-Gil bases this challenge on Agent Martinez's and Agent Loa's testimony about the arrest. Martinez testified that after the agents told Garcia-Gil that he was under arrest, he stood up, put his head down, and placed his hands behind his back. According to Martinez, "[h]e didn't ask us, you know, at that point what he was under arrest for."[6] Loa likewise testified that Garcia-Gil, upon being informed that he was under arrest, "without asking why, turned around, placed his hands behind his back."

Use at trial of pre-*Miranda* silence is not necessarily unconstitutional. "[T]he Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, . . . or after arrest if no *Miranda* warnings are given. Such silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993) (citations omitted). "The admission of evidence that a defendant remained silent on arrest and before a *Miranda* warning turns on

_____

[6]Martinez testified this way in response to the question "And once you saw the white powder, what did you do next?" Martinez's full answer was,

> We came around front where Mr. Garcia was sitting at, and we told him that he was under arrest. Agent Loa handcuffed him. When we told him he was under arrest, he stood up, and he put his hands behind his back. Kind of put his head down. He didn't ask us, you know, at that point, you know, what he was under arrest for.

fact specific weighing by the trial judge." *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995).

Garcia-Gil emphasizes that in this case, his silence was used as part of the prosecution's case-in-chief, not for impeachment purposes. He argues that silence can only properly be used as impeachment evidence. This court has held otherwise.

In *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996), the court found no error in the prosecution's use of the defendant's pre-arrest silence in its case-in-chief and in its closing argument. The defense's theory of the case was that Zanabria had been forced to smuggle drugs because of threats against his daughter. *Id*. at 592. In its case-in-chief, the Government introduced testimony that, before arrest, Zanabria did not mention any threats against his daughter. *Id*. at 593. The court concluded,

> The fifth amendment protects against compelled self-incrimination but does not, as Zanabria suggests, preclude the proper evidentiary use and prosecutorial comment about every communication or lack thereof by the defendant which may give rise to an incriminating inference. We find no error in the use of this evidence or in the prosecutor's comments thereon.

*Id*. at 593. Thus, this circuit's precedent prevents Garcia-Gil from drawing a distinction based on whether the silence was used as impeachment evidence or as substantive evidence of guilt.

Essentially, Garcia-Gil argues that all testimony about postarrest silence violates the Fifth Amendment when introduced

11

as evidence of guilt.  He does not distinguish his case from *Zanabria*, in which this court concluded that evidence of the defendant's silence could be used in the Government's case-in-chief.  Moreover, Garcia-Gil does not explain how this testimony prejudiced him, except to comment that the evidence against him was "slim," a characterization not supported by the record.  In short, Garcia-Gil has not established error.

**Sentencing Guidelines**

Garcia-Gil also raises two issues about the application of the federal sentencing guidelines to his case.  He claims that he was entitled to both a safety valve reduction and a reduction for playing a minor role in the offense.  Since the parties submitted their briefs, the Supreme Court decided *United States v. Booker*, 125 S.Ct. 738 (2005).  In *Booker*, the Court held that a sentence based on judge-made fact findings under mandatory federal sentencing guidelines violates a defendant's Sixth Amendment rights.  125 S.Ct. at 750, 756.  As a remedy, the mandatory aspects of the federal sentencing guidelines were severed from the rest of the statute, as were the sections relating to appellate review.  *Id*. at 764.

In reviewing pre-*Booker* sentences, "when a district court has imposed a sentence under the Guidelines, this court continues after *Booker* to review the district court's interpretation and application of the Guidelines de novo."  *United States v.*

*Villegas*, 404 F.3d 355, 359 (5th Cir. 2005).  This court has also concluded that factual issues relating to the guidelines and decided before *Booker* continue to be reviewed for clear error. *United States v. Creech*, —— F.3d ——, No. 04-40354, 2005 WL 1022435, at *6 (5th Cir. May 3, 2005).

**Safety Valve**

Garcia-Gil's first sentencing argument is that the district court erred by not granting him relief under the safety valve provision, 18 U.S.C. § 3553(f) and U.S. Sᴇɴᴛᴇɴᴄɪɴɢ Gᴜɪᴅᴇʟɪɴᴇs Mᴀɴᴜᴀʟ §§ 2D1.1(b)(6) & 5C1.2 (2004).  Under this provision, a defendant convicted of certain drug crimes is sentenced under the otherwise applicable guideline range, rather than the statutory mandatory minimum, if he establishes that he meets certain requirements. These requirements are:

> (1) [T]he defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>
> (2) [T]he defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) [T]he offense did not result in death or serious bodily injury to any person;
>
> (4) [T]he defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and
>
> (5) [N]ot later than the time of the sentencing hearing, the defendant has truthfully provided to the Government

13

all information and evidence the defendant has concerning
the offense or offenses that were part of the same course
of conduct or of a common scheme or plan, but the fact
that the defendant has no relevant or useful other
information to provide or that the Government is already
aware of the information shall not preclude a
determination by the court that the defendant has
complied with this requirement.

18 U.S.C. § 3553(f).

In this case, the district court determined that Garcia-Gil did not qualify for a safety valve reduction because he did not satisfy the fifth, "tell-all" requirement. The parties disagree about the basis for this decision. The Government contends that the district court based its decision on an implicit finding that Garcia-Gil's information was incomplete and not entirely truthful. Garcia-Gil, on the other hand, contends that the district court determined, as a matter of law, that a defendant who provided all the information he had but still maintained his innocence could never be entitled to a safety valve reduction.

Garcia-Gil provided information to Agent Novar but continued to claim that he was innocent. The probation officer reasoned that despite this information, Garica-Gil's claim of innocence prevented him from receiving the safety valve reduction. Garcia-Gil objected to this assertion and argued that the safety valve statute requires him to provide truthful information, but does not necessarily require him to admit guilt. The district court disagreed, stating, "It is contemplated that you provide information to the government——you know, about your involvement.

14

And certainly you are going to admit your involvement, and most certainly after a jury has found you guilty."

On appeal, Garcia-Gil argues that the district court improperly read a requirement that a defendant admit his guilt into the requirement that he truthfully provide the Government with all the information and evidence that he has. Garcia-Gil contends that the two issues are separate and relies on *United States v. Sherpa*, 110 F.3d 656 (9th Cir. 1996), to support this distinction.

In *Sherpa*, the Ninth Circuit held that the district court did not err in awarding a defendant a safety valve reduction even though he continued to insist that he did not know that he was transporting drugs. *Id*. at 663. The court concluded that the judge could find that the defendant was being truthful and complete in his disclosures despite his continued claims of innocence. *Id*. at 660-61. *Sherpa* is based on the difference between the judge's factual findings and the jury's. *Id*. at 660. Thus, the *Sherpa* court indicated that "[t]he judge is privy to far more information than the jury and is therefore in a much different posture to assess the case and determine whether the defendant complies with § 3553(f)." *Id*. at 660. The court continued,

> A judge, therefore, could logically find that reasonable minds might differ on a given point so as to preclude a judgment of acquittal, but conclude that *he or she* would have voted differently had he or she been a juror. While

15

> the judge's personal disagreement has no impact on the jury's finding of guilt, . . . such disagreement is properly considered in the judge's sentencing decision.

*Id.* at 661.

But *Sherpa* does not go as far as Garcia-Gil contends it does. The *Sherpa* court stated that "[all information relevant to the offense], of course, encompasses [the defendant's] role in the offense, including whether he knew that there were drugs secreted in the suitcase—such knowledge being an element of the offense charged." *Id.* at 660. Therefore, even under *Sherpa*, the issue is not whether a defendant can continue to falsely maintain his innocence and still receive a safety valve reduction.[7] Instead, the issue is whether, despite the jury verdict, the district court can believe those protestations of innocence and grant safety valve relief.

Furthermore, other circuits have reached different conclusions than the *Sherpa* court did. *See United States v. Reynoso*, 239 F.3d 143, 149-50 (2d Cir. 2000) (calling *Sherpa* "wrongly decided" and declining to follow it); *see also United States v. Buenrostro-Flores*, No. 03-2545, 2004 WL 1943218, at *6 (7th Cir. 2004) ("In light of a jury verdict against him and the

---

[7]Thus, for Garcia-Gil to prevail under *Sherpa,* he would have to show that the district court erred in finding that, contrary to the jury verdict, he did not know the drugs were in the pickup. Although *Sherpa* would allow the district court to reach such a finding, it does not seem, given the facts of this case, that *Sherpa* would require it.

16

evidence we found earlier to have been sufficient to support that verdict, Buenrostro has not met the burden of proving his eligibility for the safety valve reduction.").

Nevertheless, the Government does not argue in favor of a per se rule that a guilty verdict precludes safety valve relief. Instead, the Government argues that the district court implicitly found that Garcia-Gil had not been truthful or that his continued claim of innocence prevented him from disclosing all his information, such as the drugs' source or destination. We agree.

In the end, Garcia-Gil has not established that he is entitled to safety valve relief. The district court did not err when it concluded that Garcia-Gil failed to fulfill the "tell-all" requirement. Although it is possible, if the court follows *Sherpa*, for the district court to believe a defendant's protestations of innocence and find that he has told the prosecution all he knows, such a finding is certainly not required. Instead, we easily accept the district court's finding that Garcia-Gil was not being truthful and that this lack of candor disqualified him from safety valve eligibility. We do not need to adopt or reject the Ninth's Circuit's reasoning in *Sherpa*.

**Mitigating Role**

Garcia-Gil also claims that he was entitled to a reduction for playing a minor role in the offense. The guidelines provide

17

for a four-level reduction "[i]f the defendant was a minimal participant in any criminal activity" and a two-level reduction "[i]f the defendant was a minor participant in any criminal activity." U.S. SENTENCING GUIDELINES MANUAL § 3B1.2(a)&(b)(2004). To be a minor participant, the defendant generally must be "substantially less culpable" than the average participant in the criminal activity. *United States v. Brown*, 54 F.3d 234, 241 (5th Cir. 1995).

Garcia-Gil contends that he was entitled to a mitigating role reduction because he was merely a courier. Citing application note 3(A) to § 3B1.2, he argues that couriers are not necessarily excluded from a mitigating role reduction. The application note provides,

> A defendant who is accountable under 1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under 1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.

U.S. SENTENCING GUIDELINES MANUAL § 3B1.2 application note 3(A)(2004). Yet not being automatically precluded is not the same thing as being entitled to a reduction.

Garcia-Gil also contends that the Government essentially conceded his minor role during its closing argument by impliedly

18

agreeing that he owned neither the pickup nor the cocaine. He finds this concession in the Government's argument that the owner of the cocaine would not have let him drive the pickup if he did not know he was transporting cocaine. He also argues that the Government essentially conceded his limited role when it argued that his poverty was a motive for transporting the drugs. According to Garcia-Gil, this argument implied that he could not have organized a large drug-trafficking scheme. We do not agree that the Government conceded Garcia-Gil's minor role.

On the whole, Garcia-Gil has not presented a persuasive argument that he is entitled to a reduction for a mitigating role. The district court's conclusion was not clearly erroneous.

### *Booker*

Garcia-Gil also argues, citing *Booker*, that the mandatory nature of the federal sentencing guidelines at the time of his sentencing violated his Sixth Amendment rights. He raises this issue for the first time on appeal; therefore our review is for plain error. *United States v. Mares*, 402 F.3d 511, 520(5th Cir. 2005). Thus, we cannot reverse the district court "unless there is '(1) error, (2) that is plain, and (3) that affects substantial rights. . . . If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial

proceedings.'" *Id*.(quoting *United States v. Cotton*, 535 U.S. 625, 631,(2002)). The Government concedes that under *Booker,* the error in this case (sentencing under a mandatory guideline regime) was plain and that the first two prongs are therefore satisfied.

At issue, then, is the third prong——whether the error affected substantial rights. Under this prong, "the pertinent question is whether [the defendant] demonstrated that the sentencing judge——sentencing under an advisory scheme rather than a mandatory one——would have reached a significantly different result." *Id*. at 521. Garcia-Gil argues that he can present evidence that the district court would have sentenced him differently. Specifically, Garcia-Gil argues that unlike in *United States v. Mares*, the district court in his case gave him a sentence at the bottom of the guideline range. He contends that based on this sentence, we should presume prejudice.

Nevertheless, a sentence at the bottom of the guidelines, standing alone, is not enough to satisfy the plain error standard. In *United States v. Hernandez-Gonzalez*, the court concluded on a petition for rehearing that the defendant had not satisfied his burden when he showed that "(1) the judge imposed the minimum sentence under the Guidelines; (2) he suffered from an alcohol abuse problem that was responsible for much of his criminal history; and (3) he had returned illegally to the United

20

States to earn money for his family in Honduras." — F.3d ——, No. 04-40923, 2005 WL 724636, at *1 (5th Cir. March 30, 2005). The *Hernandez-Gonzalez* court explained,

> [The defendant] points to no remarks made by the sentencing judge that raise a reasonable probability that the judge would have imposed a different sentence under an advisory scheme. Hence, even if [the defendant] had made this argument before the decision issued on this direct appeal, it would have failed under the plain-error test.

*Id.* Therefore, merely showing a sentence at the bottom of the applicable guidelines range, as Garcia-Gil does, is insufficient to show plain error in his sentence.

**Apprendi Challenge**

In his brief, Garcia-Gil also argues that the drug quantity and type provisions of 21 U.S.C. § 841 (a) and (b) are facially unconstitutional under the principles articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Garcia-Gil admits that his argument is foreclosed by *United States v. Slaughter*, 238 F.3d 580, 582 (5th Cir. 2000). Nothing interferes with *Slaughter*'s application here, and thus we overrule Garcia-Gil's *Apprendi* objection.

**Conclusion**

For these reasons, we affirm the judgment of the district court.

AFFIRMED.

21